# In the United States Court of Federal Claims

No. 10-877C
(Filed under seal April 11, 2011)
(Reissued May 11, 2011)[1]

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| **TECH SYSTEMS, INC.,** | Post-award bid protest; Coast Guard tailoring services contract; great deference for technical and past performance evaluations; relevance of past performance; individual evaluators' views; discussions ignoring price; best value tradeoff; explanation of responsibility determination unnecessary; bias and bad faith unproven; management not an evaluation factor; not an "essay-writing contest." |
| Plaintiff, | |
| v. | |
| **THE UNITED STATES,** | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*James Scott Phillips*, Centre Law Group, LLC, Vienna, VA, for plaintiff. *Brian C. Caney*, *Eric S. Cruius*, and *Sarah C. Schauerte*, all of Vienna, VA, of counsel.

*Charles M. Kersten*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Donald E. Kinner*, Assistant Director, all of Washington, D.C., for defendant.

## OPINION AND ORDER

WOLSKI, Judge.

Plaintiff Tech Systems, Inc. ("Tech Systems" or "TSI") filed this post-award bid protest, challenging the decision of the United States Coast Guard ("USCG" or "Coast Guard") to award to Court House Cleaners ("CHC") a contract to perform fitting, tailoring and garment-pressing services. Tech Systems alleges that the Coast Guard arbitrarily evaluated its proposal and that of CHC, violating provisions of the Federal Acquisition Regulation ("FAR") and departing from the

---

[1] This opinion was originally issued under seal, with the parties given the opportunity to suggest redactions. The parties proposed that non-public, proprietary pricing information be redacted, and this has been replaced in the following manner: "[XXXX]." The Court did not find defendant's requested redaction of the names of certain individuals involved in the procurement to be justified. The opinion is released for publication, with some minor, non-substantive corrections.

solicitation criteria, and that the award was tainted by the bias and bad faith of Coast Guard officials.  Specifically, plaintiff -- a corporation which has held several large contracts to perform tailoring work for the U.S. military -- contends that the Coast Guard acted unreasonably in giving it and CHC -- a small local business which had never before been awarded a competitively-bid government contract -- the same technical and past performance ratings.  Tech Systems has moved for judgment on the administrative record and for permanent injunctive relief, and the government has cross-moved for judgment on the administrative record.  For the reasons that follow, the Court DENIES the motions of Tech Systems, and GRANTS the cross-motion of the government.

## I.  BACKGROUND

### A.  The Solicitation

Plaintiff Tech Systems had, since 2005, been the incumbent contractor providing fitting, alteration, and garment-pressing services for Coast Guard recruits being trained at the USCG Training Center ("TRACEN") in Cape May, New Jersey.  Admin. R. ("AR") at 5.  The contract was originally set to expire in April 2010.  *See* Def.'s Mot. to Supp. Admin. R. ("Def.'s Mot."), Ex. 4 (Rodriguez Decl.) ¶ 6.  A series of bridge contracts have maintained plaintiff's performance to the present.  *See* AR at 5; Def.'s Status Rep. (Mar. 2, 2011).  On August 19, 2010, the USCG issued a Request for Proposals ("RFP") under Solicitation Number HSCG23-10-R-PUD 703 (the "Solicitation"), seeking proposals from offerors to "furnish[] fitting, alteration/tailoring and garment pressing services" for "Accession Personnel (trainees)" at TRACEN.  AR at 51.  This acquisition was a small-business set-aside under an indefinite-delivery/indefinite-quantity ("IDIQ") type contract.  *Id.*  According to the Solicitation, performance would take place at TRACEN for a base period of twelve months, with four twelve-month options.  AR at 48-49.

The RFP provided instructions to offerors on the submission of proposals.  AR at 98.  Each proposal was to contain three separate volumes: a Technical (or Technical Capability) Proposal, a Business (cost/price) Proposal, and a Relevant Past Performance Proposal.  AR at 98-100.  Requiring clear and concise descriptions of the offeror's response to the requirements of the solicitation, the RFP rejected "general or vague statements such as 'standard procedures will be used' or 'good tailoring practices will be employed.'" AR at 99.  The subjects of each of the volumes -- Technical Capability, Price, and Relevant Past Performance -- were identified as the three evaluation factors.  AR at 101.  Of these three factors, the Solicitation provided that "Technical Capability is more important than relevant past performance," and that those two factors combined were more important than price.  AR at 101.  Offerors were advised, however, that "as proposals become more technically equal, price could become a determining factor." *Id.*

For the Technical Capability Proposal, offerors were required to "[d]emonstrate the understanding of the requirements and ability to implement the services necessary to accomplish

satisfactory performance under the PWS." AR at 99.  Technical Capability would be evaluated using five subfactors:

1.  Performance Process.  Demonstrated understanding of the performance processes and systems from receipt of accession personnel for service events or unscheduled tasks to completion of alteration and/or other tailoring services.

2.  Equipment.  Demonstrated capability to successfully meet the requirements of the prospective contract in terms of contractor furnished equipment (CFE) as it relates to the Offeror's performance of the tasks under the PWS.

3.  Staffing Plan.  Demonstrated staffing plan that shows an understanding and capability to provide the necessary staffing to perform alterations and/or tailoring for the accession loading plan.

4.  Quality Control (QC) Plan.  Demonstrated QC plan that shows the technical capability to provide a high quality of services and has procedures for accomplishing and verifying actions taken to correct noted deficiencies.

5.  Accession Personnel Loading.  Demonstrated procedures to implement and manage significant volume variances as shown in Attachment 1 Enclosure 6.1., CGRC FY11 Weekly Recruiting Loading Plan for FY 11.

AR at 102.  The RFP also instructed offerors to provide a Business (cost/price) Proposal, for which they must follow a price proposal format and include certifications and other pertinent information.  AR at 100, 103.

For the Relevant Past Performance Proposal, the RFP required three references from federal, state, or local government agencies or private entities.  AR at 100, 103.  The purpose of the references was "to demonstrate capability and capacity to deliver high quality services and solutions for the tasks and requirements within the PWS."  *Id.*  Offerors were told that this evaluation would "focus on the size, scope and complexity of the efforts, the degree of relevance to the PWS, the extent to which performance measures and service level metrics were applied to specific program objectives, and the actual results achieved against these measures."  AR at 103.  The service level metrics and performance measures were not required, but Offerors "able to identify" them "may be evaluated favorably."  *Id.*

Appended to the Solicitation was a Performance Work Statement ("PWS") for tailoring services and six attachments that offered further clarifications regarding the contract.  For example, Section 1.0 of the PWS provided details such as the scope of the procurement ("fitting, alteration/tailoring and garment pressing services" or "tailoring services" collectively), responsibilities of contractor and key personnel, and the contractor quality control("QC")/government quality assurance surveillance plan.  AR at 104-08, 233-37.  In

Section 3.0, the PWS explained the use of government furnished property and provision of utilities, fire/police/rescue, maintenance, and other services.  AR at 109-10, 238-39.  Section 5.0 contained the tailoring services requirements, as well as procedures for damaged, lost, and/or missing clothing.  AR at 110-13, 239-42.  Section 8.0 listed the deliverables considered "***most important*** for the successful performance of this contract": compliance with the Coast Guard's Uniform Fitting and Alteration Manual, timeliness of the alteration or tailoring of the uniform or uniform items per company, and the absence of damaged, lost, or missing articles of clothing. AR at 114, 243 (emphasis in original).

In Attachment 6.1, the PWS provided the Accession Personnel Loading Plan, which offered a weekly schedule estimating the number of personnel that would require tailoring.  AR at 115-16.  Attachment 6.2 listed items of equipment "<u>representative</u> of those items used in the performance" of previous tailoring services for the Coast Guard.  AR at 117 (emphasis in original).  Attachment 6.3 gave further details about USCG uniforms, such as the method for taking body measurements, men and women's fitting guides, and uniform appearance problems. AR at 119-174.  In Attachment 6.5, the PWS addressed uniform issue procedures for men and women.  AR at 176-185.

## B.  The Source Selection Plan

According to the Source Selection Plan ("SSP"), the Contracting Officer would distribute copies of the offerors' technical proposals to a Technical Evaluation Team ("TET") consisting of Lt. Angel Rodriguez, the chairman of the TET; and Mr. Rob Evelyn, the current contracting officer's technical representative ("COTR").  AR at 250.  With the assistance of a TET Evaluation Consultant, Mr. Joe DeBlase, each TET member was to perform an independent technical evaluation, identifying and recording strengths, weaknesses, significant weaknesses, and deficiencies for each proposal.  AR at 254.  The evaluation was to be based on the five subfactors identified in the RFP.  *See* AR at 258.

In addition, the TET was to define the benefit expected from a proposed strength, comment on the expected impact of any noted weakness or significant weakness on contract performance, and explain deficiencies and how they can be corrected.  AR at 254.  "At no time [should] proposals be evaluated against each other," the TET was instructed.  *Id.*  Each TET member was to assign a rating for each factor based on documented merits and record the ratings on evaluation worksheets.  AR at 255.

The TET was also tasked with conducting a risk assessment by evaluating the probability of success or failure in performing the solicitation requirements.  AR at 254-255.  In making an independent judgment, each evaluator was to fully document the risk assessment on evaluation worksheets and discuss proposal risk in the evaluation narratives.  AR at 255.  "The risk assessment and rating assigned to a factor are independent of each other," the SSP provided.  *Id.* A proposal considered superior could be associated with a high degree of risk, while a proposal rated satisfactory may be low-risk.  *Id.*

With the completion of the independent evaluations of each proposal, the TET was to meet to discuss the members' findings and reach a TET consensus based on each proposal's merits, ratings, and risk assessment. AR at 255. One set of evaluation worksheets should document this TET consensus and identify it as such. *Id.* If the TET members could not reach a consensus, the Contracting Officer was to receive a minority report, with the dissenting opinions and basis for disagreement. AR at 255.

If there were a TET consensus, the chairman was to prepare a Technical Evaluation Report. This written report would have a consolidated narrative that included the assigned ratings and risk assessment for each offeror. AR at 256. For each rating, a narrative of strengths, weaknesses, significant weaknesses, and deficiencies was to support the rating. *Id.* All evaluation worksheets, identified by TET member or as the team consensus, were to be submitted to the Contracting Officer with the Technical Evaluation Report. *Id.*

The SSP also provided for a Relevant Past Performance Evaluation Team ("PPT") -- a "team" consisting of just one individual, Chief Warrant Officer John Petro. AR at 251. The PPT was responsible for evaluating proposed past performance information to determine relevance. AR at 256. Chief Warrant Officer Petro was to base his evaluation on information from references listed in the offerors' proposal, the USCG database, and other sources as required. *Id.* There were four subfactors identified: 1) product quality; 2) timeliness; 3) cost control; and 4) customer satisfaction. AR at 259.

In addition, the Source Selection also listed contract specialist ("KS") James Dawson as the Price Evaluation Team ("PET"). AR at 251. Tasked with conducting evaluations of offerors' price proposals, the PET was responsible for establishing the reasonableness of each proposal. AR at 251, 256. The PET was to compare the price proposals to price data from the Independent Government Cost Estimate ("IGCE") and rank them all based on total price, including the base plus all option periods. AR at 256. A Pre-negotiation Memorandum, if used, and the Competitive Award Memorandum were to document the price evaluations. *Id.*

If an award could not be made on initial offers, discussions were necessary. AR at 256. The KS was to prepare a Pre-negotiation Memorandum to recommend a competitive range to the Contracting Officer, pursuant to 48 C.F.R. § 15.306(c). *Id.* This memorandum was to be based on the technical evaluation report, past performance evaluation, price evaluation, and other related requirements in the solicitation. *Id.* Acting as the Source Selection Authority ("SSA"), the Contracting Officer was to review and approve the Pre-negotiation Memorandum. *Id.*

In the event that discussions were necessary, the Contracting Officer or a designated representative was to conduct them with all offerors determined to be in the competitive range. AR at 257. At the Contracting Officer's request, evaluation team members could also participate in discussions. *Id.* The evaluation team was to document all responses to discussion questions under the same process used for the initial evaluations. *Id.* Using a new evaluation worksheet and evaluation report, the evaluation team was to note any affected strengths, weaknesses,

deficiencies, ratings, or risk assessments. *Id.* All offerors remaining in the competitive range were to submit a final revised proposal after the discussions, which would be evaluated and documented in the same process as was used to review the initial proposals. *Id.*

Under the SSP, the Contracting Officer was then to approve a Post-negotiation Memorandum documenting the process and findings, considering all evaluation information and analyses. AR at 257. As the SSA, the Contracting Officer was to select an offeror based on best value using a trade-off continuum analysis. *Id.* While acting based on an independent assessment of all available information, the SSA could seek advice from the TET, PET, and KS. *Id.* With the selection of the best overall value for the government, the Contracting Officer would then issue the award notification and award the contract. *Id.*

## C. Evaluations and Discussions

The agency received five timely proposals for the TRACEN contract, from offerors Court House Cleaners, Tech Systems, Ben-Mar Enterprises ("Ben-Mar"), Jesse Tailor Co. ("Jesse"), and Youngs Cleaners. *See* AR at 532-34. Members of the TET composed initial review reports for each of the offerors, dated September 16, 2010. AR 473-531. On the same day, the TET also presented a Pre-negotiation Business Clearance Memorandum that established a competitive range of CHC, Tech Systems, and Ben-Mar. AR at 535-536. This memorandum also recommended discussions with these three offerors. AR at 536. The TET needed further documentation regarding CHC's Quality Control Plan and Tech Systems' and Ben-Mar's "Procedures, Equipment & QA." AR at 534.

### *1. First Round of Discussions*

On September 17, 2010, the USCG informed Tech Systems that it was within the competitive range and offered it the opportunity to revise its proposal to correct deficiencies. AR at 611. The agency held discussions with Tech Systems concerning six tailoring services needed for alterations, its plan for installation of equipment, and its Quality Control Plan. AR at 614. Tech Systems responded in writing on September 21, 2010, addressing weaknesses in its summary of tailoring processes by providing step-by-step instructions for various sewing processes. AR at 376-379. With respect to its execution plan for equipment set-up or installation, Tech Systems responded that, as the incumbent contractor, it already had all equipment on-site. AR at 379. To clarify its QC Plan, Tech Systems detailed the process steps for Quality Assurance for Alterations, provided a weekly schedule for the time frame for completion of repairs and customer deficiencies, and explained its system for damaged items. AR at 379-382.

The USCG also contacted CHC on September 17 for discussions to address deficiencies in its Quality Control Plan. AR at 609-610. CHC revised its technical proposal and submitted the new version by e-mail on September 21. AR at 295-304.

-6-

### 2. TET Consensus

On September 28, 2010, the TET produced a TET Consensus that provided a synopsis of offerors' ratings.  AR at 625-627.  Both CHC and Tech Systems were rated Satisfactory, having proven to be "significantly technically capable" and "equally capable of providing the services required to the government."  AR at 625.  The TET found that CHC had an advantage in its "overall explanations of [its] tailoring processes and quality control documentation process."  *Id.* In contrast, Tech Systems' advantages lay in its ability "to manage tailoring processes" and in "having the needed equipment, as it is already in place."  *Id.*  Finding that the two offerors' advantages were "[e]qually balanced," the TET stated that "the overall quantitative advantages would have to lay with price comparisons and past performance history."  *Id.*  The TET considered Ben-Mar's technical package to be Satisfactory; its tailoring processes, however, were found to offer lesser benefit to the government.  *Id.*

For the risk assessment of offerors' proposals, the TET Consensus rated both CHC and Tech Systems as having Low risk.  AR at 626.  According to the TET Consensus, CHC had provided "a complete package" and "set the bar, highlighting themselves apart from the other vendors by addressing the RFP appropriately."  *Id.*  The TET did acknowledge, however, that CHC's initial proposal required clarification concerning quality control.  *Id.*  Tech Systems, on the other hand, was "technically capable" and "able to effectively perform per government requirements."  *Id.*  The TET, though, believed that the examples Tech Systems placed in the technical proposal concerning its experience as the incumbent contractor were "better left for evaluation under past performance."  *Id.*  Also, the TET noted that Tech Systems did not provide tailoring methods, which had to be requested in the discussions.  AR at 626.  The TET considered Tech Systems' Service Dress Blue ("SDB") processes to be clear and satisfactory, but it preferred other offerors' methods.  *Id.*  In contrast to CHC and Tech Systems, Ben-Mar was considered as presenting Moderate risk, because it had minor weaknesses in tailoring processes and would need significant oversight and task direction.  *Id.*

### 3. Second Round of Discussions

The Contracting Officer did not accept the TET Consensus Evaluation Report and requested additional information.  AR at 587.  On October 7, 2010, the KS prepared a Second Pre-negotiation Business Clearance Memorandum.  *Id.*  Upon a second review of CHC's proposal, the Contracting Officer had noted weaknesses in CHC's failure to specifically address the performance process for Friday recruiting events and Direct Entry Petty Officer Training events; its capability to obtain and install equipment and associated risks; its capability to provide necessary staffing and associated risks; and its procedures to implement and manage significant volume variances in Accession Personnel Loading.  AR at 591, 607-608.  The agency communicated these weaknesses to CHC on the same day, and CHC submitted revisions to its technical proposal on October 15.  AR at 288-294.

The Contracting Officer also contacted Tech Systems on October 7, 2010, because he noted one additional weakness in its staffing plan -- it did not describe the quantity and type of positions proposed for work on-site.  AR at 592, 605.  The agency held discussions on October 13, AR at 598, and Tech Systems responded by e-mail on the same day with proposed staffing by labor category.  AR at 371.

### 4. Technical Evaluation Team Report

On October 19, 2010, the TET submitted a Technical Evaluation Team Report to the Contracting Officer.  AR at 629.  Based on a review of the proposals after the second round of discussions, the report consolidated the assigned ratings and degree of risk assessed for each subfactor.  It also provided a narrative of the offerors' strengths, weaknesses, significant weaknesses, and deficiencies.  AR at 632.

Court House Cleaners received an overall rating of Satisfactory for the Technical Capability factor, with a rating of Low for risk.  AR at 634.  According to the TET Report, CHC "had the most complete proposal," but the report acknowledged that CHC's initial Quality Control Plan did not provide enough detail.  *Id.*  With its submission of supplemental technical information, CHC was rated Satisfactory for both the Performance Process and QC Plan subfactors.  AR at 634-635.  Moreover, the TET decided that the supplemental technical information raised CHC's rating for the Staffing Plan subfactor to Superior.  AR at 634.

Tech Systems received an overall rating of Satisfactory for the Technical Capability factor with Low assessed risk.  AR at 635.  According to the TET Report, Tech Systems' initial proposal was "written as though the government should already have the requested evaluation factor information because of the incumbent status" and included "examples better left for evaluation under past performance."  *Id.*  Among Tech Systems' supplemental technical information, the TET still considered the SDB uniform tailoring process to be a minor weakness. *Id.*  Moreover, Tech Systems received a Moderate risk rating under the Staffing Plan subfactor, because its use of part-time staff affected "retention of staffs [sic] effectiveness and expertise." AR at 636.  Tech Systems, however, did receive a Superior rating for Equipment and an overall Low risk assessment as the incumbent contract holder.  *Id.*

Ben-Mar received a Satisfactory rating for technical capability and a Moderate risk assessment.  AR at 637.  The TET concluded that Ben-Mar's administrative and tailoring processes "were of lesser benefit to the government" based on the quality and detail of its proposal.  *Id.*  Ben-Mar received a Moderate risk rating overall and for each of the five subfactors, as the lack of detail in Ben-Mar's proposal was taken to indicate that it would require significant oversight.  AR at 638.

With the evaluation of those three proposals, the TET concluded that CHC and Tech Systems were equal in terms of technical capability and offered low risk.  *Id.*  Either offeror "can be confidently endorsed by the convening TET."  *Id.*

### *5. Relevant Past Performance Evaluation*

Chief Warrant Officer John Petro conducted the past performance review and submitted his evaluation worksheets for the Initial Review Report on September 17, 2010. AR at 538. Court House Cleaners received a Superior rating for its "excellent record of productivity and no exposed flaws." AR at 540. The evaluator also noted CHC's "well-built rapport with the local community" and "good references." AR at 539. Tech Systems also received a Superior rating for its "[e]xcellent package," which "included previous and current contracts to show the level of capability." AR at 543. In his recommendation, CWO Petro emphasized Tech Systems' "previous experience with several branches of the military services" and "strong past performance presentation." AR at 542. Ben-Mar was rated Satisfactory. AR at 547. The evaluator concluded that he would need "a list of more current work evaluations and references to make a better determination." *Id.* The other two offerors received Marginal ratings. AR at 550, 552.

### *6. Price Evaluation*

On October 18, 2010, Contract Specialist James J. Dawson submitted to the Contracting Officer a Price Evaluation Report on the three offerors in the competitive range. AR at 640-42. The KS calculated prices by adding the total price for the basic requirement to the total price for all options, based on fixed unit price for contract line items. AR at 640. This evaluation produced a total price of $2,097,582.00 for CHC; $[XXXXXXX] for Tech Systems; and $[XXXXXXX] for Ben-Mar. AR at 641. Based in part on the Tech Systems' historical costs as the incumbent, Mr. Dawson also calculated the Independent Government Cost Estimate (IGCE) of $3,077,000.00, for use in evaluation of price reasonableness. *Id.*; AR at 9. After comparing the three proposals to the IGCE, Mr. Dawson concluded that CHC offered best value with its lowest offered price, followed by Tech Systems with the second best value. AR at 642. Ben-Mar's offered price was "not the best value" as it was higher than the IGCE. *Id.*

## D.  Source Selection Decision

The Contracting Officer on October 20, 2010 approved an award to CHC for an estimated dollar amount of $2,097,582.00. AR at 650. The Competitive Price Negotiation Memorandum (PNM)/Post Negotiation Business Clearance Memorandum repeated information from the TET Consensus and the TET Report, the Price Evaluation, and the Relevant Past Performance Evaluation. AR at 650-665. Based on this information, the Contracting Officer conducted a tradeoff analysis for the best value determination. AR at 665. He noted that the SSP "states that as the Offerors [sic] technical capability becomes more equal price becomes more of a determining factor." *Id.* As CHC offered "essentially equal technical capability and past performance rankings and risk levels as Tech Systems . . . but offered a much lower price than both" other offerors in the competitive range, the Contracting Officer concluded that CHC offered the best value. *Id.*

**E. Post-Award Debriefing and Protest Before the GAO**

Tech Systems received notification that the contract had been awarded to CHC on November 5, 2010.  Compl. ¶ 34.  The award notice stated that Tech Systems' "proposal was rated as equal to Court House Cleaners for Technical Capability and Past Performance combined but your total price was approximately [XX]% higher than Court House Cleaners."  *Id.*  Price was considered "the determining factor for award."  *Id.*  In response, Tech Systems requested a post-award debriefing from the USCG on November 8 and received one on November 17.  Compl. ¶ 35.  At the post-award debriefing, the USCG explained the SSA's tradeoff analysis and indicated that Tech Systems was the second-ranked offeror, with no weaknesses.  Compl. ¶ 37-38.

**F. Procedural History**

On November 22, 2010, Tech Systems filed a protest with the Government Accountability Office, challenging the award to CHC on two general grounds.  Compl. ¶ 55.  First, Tech Systems argued that the agency's technical evaluation of Tech Systems and CHC was "transparently flawed and improper."  Compl. ¶ 56.  Second, Tech Systems alleged that the agency violated the Procurement Integrity Act ("PIA"), 41 U.S.C. § 423(a), by disclosing competitive information to CHC; that the procurement was tainted by a government official acting in bad faith; and that CHC's access to confidential information through a personal friendship with that government official created an organization conflict of interest.  Compl. ¶ 57.  The GAO dismissed the protest.  Compl. ¶ 58.

The next month, Tech Systems filed its post-award bid protest in our court.  Plaintiff challenged the award to CHC based on alleged violations of both the Competition in Contracting Act ("CICA"), 41 U.S.C. § 253, and the PIA, 41 U.S.C. § 423(a), and also breach of the implied-in-fact contract to fairly consider all offerors' proposals.  *See* Compl. ¶¶ 3, 60-63, 66-69, 72-74.  In addition, Tech Systems contended that the agency improperly determined its past performance rating, *id.* ¶¶ 56, 62(a); its technical performance rating and that of CHC, *id.* ¶¶ 17-26, 56, 62(b),(d); and the risk rating given to CHC.  *Id.* ¶ 56, 62(c).  According to Tech Systems, it did not receive meaningful discussions on its price proposal during the procurement process.  *Id.* at 29, 32, 56, 62(e).  Tech Systems also alleged that CHC had access to its confidential technical information.  Compl. ¶¶ 57, 62(f), 73.

Tech Systems also moved to supplement the administrative record with declarations from its officers and employees.  Pl.'s Mot. Supp. at 1.  According to plaintiff, the declarations supported its allegations of Chief Warrant Officer Jose Samaniego Jr.'s bias against Tech Systems and support for CHC.  Pl.'s Mot. Supp. at 3.  The government responded with five declarations asserting that, as the former Contracting Officer's Technical Representative ("COTR"), Samaniego had no role in the procurement decision.  Attachs. 1-5 to Def.'s Resp. to Pl.'s Mot. Supp.  After conducting a hearing on the motion, the Court granted plaintiff's motion to supplement the administrative record, concluding that effective judicial review would be

frustrated if the Court were not to allow the record to be supplemented with evidence of bias and bad faith allegedly coming from the former COTR's own mouth.  Memorandum Opinion and Order (March 1, 2011).  The Court subsequently granted the government's unopposed request to supplement the record with two of the original and three revised versions of the declarations submitted in opposition to plaintiff's motion to supplement.  *See* Order (March 2, 2011).

## II.  DISCUSSION

### A.  Standard of Review

Post-award bid protests are heard by this Court under the Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996 ("ADRA"), Pub. L. No. 104-320, §§ 12(a)-(b), 110 Stat. 3870, 3874 (1996).  28 U.S.C. § 1491(b)(1) (2006).  This provision requires our court to follow Administrative Procedure Act ("APA") standards of review.  28 U.S.C. § 1491(b)(4).  Those standards, incorporated by reference, provide that a:

> reviewing court shall . . . (2) hold unlawful and set aside agency action, findings, and conclusions found to be -- [¶] (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; [¶] (B) contrary to constitutional right, power, privilege, or immunity; [¶] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [¶] (D) without observance of procedure required by law; [¶] (E) unsupported by substantial evidence in a case subject to sections 556 and 557 of this title or otherwise reviewed on the record of an agency hearing provided by statute; or [¶] (F) unwarranted by the facts to the extent that the facts are subject to trial de novo by the reviewing court.
> In making the foregoing determinations, the court shall review the whole record or those parts of it cited by a party, and due account shall be taken of the rule of prejudicial error.

5 U.S.C. § 706 (2006).

Based on an apparent misreading of the legislative history, *see Gulf Group, Inc. v. United States*, 61 Fed. Cl. 338, 350 n.25 (2004), the Supreme Court had determined, before the 1996 enactment of the ADRA, that the de novo review standard of 5 U.S.C. § 706(2)(F) does not usually apply in review of informal agency decisions -- decisions, that is, such as procurement awards.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971) ("*Overton Park*").  Instead, courts in those cases are supposed to apply the standard of 5 U.S.C. § 706(2)(A): whether the agency's acts were "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *See Overton Park*, 401 U.S. at 416 (citation omitted); *see also Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057 (Fed. Cir. 2000) (applying 5 U.S.C. § 706(2)(A)).  *But see Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 n.5 (Fed. Cir. 2001) ("*Domenico Garufi*") (also citing 5 U.S.C. § 706(2)(D) as applicable in bid protests).  The "focal point for judicial review" is usually

"the administrative record already in existence," *Camp v. Pitts*, 411 U.S. 138, 142 (1973), even when, as here, the matter under review was not the product of a formal hearing. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *Axiom Res. Mgmt., Inc. v. United States*, 564 F.3d 1374, 1379 (Fed. Cir. 2009). As noted above, however, supplementation of the record was found necessary for effective judicial review of the allegations of bias and bad faith. *See Tech Systems, Inc. v. United States*, No. 10-877C (Fed. Cl., Mar. 1, 2011).

A motion for judgment on the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims ("RCFC") differs from motions for summary judgment under RCFC 56, as the existence of genuine issues of material fact does not preclude judgment on the administrative record. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1355-57 (Fed. Cir. 2005); *Fort Carson Supp. Servs. v. United States*, 71 Fed. Cl. 571, 585 (2006). Rather, a motion for judgment on the administrative record examines whether the administrative body, given all the disputed and undisputed facts appearing in the record, acted in a manner that complied with the legal standards governing the decision under review. *See Fort Carson*, 71 Fed. Cl. at 585; *Greene v. United States*, 65 Fed. Cl. 375, 382 (2005); *Arch Chems., Inc. v. United States*, 64 Fed. Cl. 380, 388 (2005). Factual findings are based on the evidence in the record, "as if [the Court] were conducting a trial on the record." *Bannum*, 404 F.3d at 1357; *see also Carahsoft Tech. Corp. v. United States*, 86 Fed. Cl. 325, 337 (2009); *Gulf Group*, 61 Fed. Cl. at 350.

Under the "arbitrary and capricious" standard, the Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment" by the agency. *Overton Park*, 401 U.S. at 416. Although "searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* The Court will instead look to see if an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285-86 (1974). The Court must determine whether "the procurement official's decision lacked a rational basis," *Domenico Garufi*, 238 F.3d at 1332 (adopting APA standards developed by the D.C. Circuit); *see also Delta Data Sys. Corp. v. Webster*, 744 F.2d 197, 204 (D.C. Cir. 1984). A second ground for setting aside a contract award is when the protester can show that "the procurement procedure involved a violation of regulation or procedure." *Domenico Garufi*, 238 F.3d at 1332. This showing must be of a "clear and prejudicial violation of applicable statutes or regulations." *Id.* at 1333 (quoting *Kentron Haw., Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C. Cir. 1973)).

Under the first, rational basis ground, the applicable test is "whether 'the contracting agency provided a coherent and reasonable explanation of its exercise of discretion.'" *Domenico Garufi*, 238 F.3d at 1333 (quoting *Latecoere Int'l, Inc. v. United States Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994)). This entails determining whether the agency "'entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs

counter to the evidence before the agency,'" or made a decision that was "'so implausible that it could not be ascribed to a difference in view or the product of agency expertise.'"  *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1375 (Fed. Cir. 2009) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Because of the deference courts give to discretionary procurement decisions, "the 'disappointed bidder bears a heavy burden of showing that the award decision had no rational basis.'"  *Domenico Garufi*, 238 F.3d at 1333 (quoting *Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 456 (D.C. Cir. 1994)).  In particular, the evaluation of proposals for their technical excellence or quality is a process that often requires the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations.  *See E.W. Bliss Co. v. United States*, 77 F.3d 445, 449 (Fed. Cir. 1996); *Arch Chems.,* 64 Fed. Cl. at 400; *Gulf Group*, 61 Fed. Cl. at 351; *Overstreet Elec. Co. v. United States*, 59 Fed. Cl. 99, 102, 108, 117 (2003) (describing the standard as "near draconian" and a "triple whammy of deference").  Challenges concerning "the minutiae of the procurement process in such matters as technical ratings . . . involve discretionary determinations of procurement officials that a court will not second guess."  *E.W. Bliss*, 77 F.3d at 449.  "[N]aked claims" of disagreement with evaluations, "no matter how vigorous, fall far short of meeting the heavy burden of demonstrating that the findings in question were the product of an irrational process and hence were arbitrary and capricious."  *Banknote Corp. of Am. v. United States*, 56 Fed. Cl. 377, 384 (2003), *aff'd*, 365 F.3d 1345 (Fed. Cir. 2004).

The presence (by the government) or absence (by the protester) of any rational basis for the agency decision must be demonstrated by a preponderance of the evidence.  *See Gulf Group*, 61 Fed. Cl. at 351; *Overstreet*, 59 Fed. Cl. at 117; *Info. Tech. & Appl'ns Corp. v. United States*, 51 Fed. Cl. 340, 346 (2001) (citing *GraphicData, LLC v. United States*, 37 Fed. Cl. 771, 779 (1997)), *aff'd*, 316 F.3d 1312 (Fed. Cir. 2003).  If arbitrary action is found as a matter of law, the Court will then decide the factual question of whether the action was prejudicial to the bid protester.  *See Bannum*, 404 F.3d at 1351-54.

## B.  Was Tech Systems Potentially Prejudiced by the Challenged Actions?

The issue of prejudice must first, however, be considered in the context of standing, before the Court may turn to the merits.  *See Info. Tech.*, 316 F.3d at 1319.  In bid protests, prejudice "is a necessary element of standing," and in all cases "standing is a threshold jurisdictional issue."  *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369-70 (Fed. Cir. 2002); *see also Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1378-79 (Fed. Cir. 2009).  Under the ADRA, actions may be brought "by an interested party objecting . . . to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1).  The Federal Circuit has construed the term "interested party" to have the same definition as under the Competition in Contracting Act, encompassing "actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by failure to award the

contract." *Am. Fed'n of Gov't Employees, AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001); *see* 31 U.S.C. § 3551(2).

An offeror establishes an interest sufficient to support a post-award bid protest by showing that it would have had a substantial chance of receiving the contract award absent the alleged procurement errors. *See Labatt*, 577 F.3d at 1380; *Info. Tech.*, 316 F.3d at 1319. This prejudice test for purposes of standing is the same as the test employed in the merits determination. *See Labatt*, 577 F.3d at 1378-80 (relying on, *inter alia*, the decisions on the merits in *Bannum*, 404 F.3d at 1354, 1358, and *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996)); *Info. Tech.*, 316 F.3d at 1319 (relying on, *inter alia*, the merits decision in *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (Fed. Cir. 1999)). But since, for purposes of standing, prejudice must be analyzed *before* a merits determination is made, it is more properly considered as a question of *potential* rather than actual prejudice, and assessed based on the cumulative impact of the well-pled allegations of agency error (which are assumed true at this juncture of proceedings). *See USfalcon, Inc. v. United States*, 92 Fed. Cl. 436, 450 (2010).

Even though the government does not challenge Tech Systems' standing, the Court finds it advisable that this jurisdictional question be explicitly determined. As was recounted above, under the RFP the technical capability factor was "more important than relevant past performance," and those two factors combined were "more important than price." Admin. R. at 101 (RFP § M.1(a)). The RFP also advised that "as proposals become more technically equal, price could become a determining factor." *Id*. In making its best value determination, the government explained that plaintiff and the awardee "had essentially equal technical capability and past performance rankings and risk levels," and thus concluded that CHC's "much lower price" was "the determining factor for award." AR at 665. Plaintiff alleges that in evaluating the proposals, the USCG gave it too low and CHC too high a technical proposal rating, did not fully appreciate the risk posed by CHC, and gave CHC too high a rating for past performance. *See* Compl. ¶¶ 16-26, 54, 56, 60-62. If these allegations are assumed to be true, *see USfalcon*, 92 Fed. Cl. at 450, then Tech Systems' technical capability and past performance factor ratings should have exceeded CHC's -- and these factors combined were more important than price. *See* Admin. R. at 101. Thus, the alleged errors potentially prejudiced Tech Systems, which would have been deprived of a substantial chance of receiving the award if it can prove the existence of these errors.[2]

---

[2]  Moreover, Tech Systems also alleges that the USCG considered its price, higher than CHC's, to be a material weakness, and that the agency deprived it of meaningful discussions by not raising the matter or responding to plaintiff's inquiry as to its price competitiveness. Compl. ¶¶ 29, 32, 62. If shown to be a clear violation of 48 C.F.R. § 15.306(d), this, too, would be to the prejudice of plaintiff, and supports the determination that Tech Systems has standing to challenge the award.

**C. Was the Decision to Award the Contract to CHC Arbitrary and Capricious?**

Tech Systems challenges the contract award to CHC, primarily arguing that the Coast Guard acted arbitrarily in evaluating the technical capability and relevant past performance proposals of the two offerors. *See* Mot. of Tech. Sys. for J. on Admin. R. & Br. in Supp. ("Pl.'s Br.") at 8-9, 26-53; Reply Br. in Supp. of Tech Sys.' Mot. for J. on Admin. R. ("Pl.'s Reply") at 7-16. Plaintiff also contends that the price factor was handled improperly, arguing that the USCG should have brought up the competitiveness of its price in discussions and should have questioned the reasonableness of CHC's price. *See* Pl.'s Br. at 53-61; Pl.'s Reply at 16-21. Tech Systems further argues that the best value tradeoff process was flawed, *see* Pl.'s Br. at 61-62, Pl.'s Reply at 20-21, and that the responsibility determination for CHC was unreasonable. *See* Pl.'s Br. at 62-64, Pl.'s Reply at 21-22. And finally, it argues that the agency's evaluations of the technical proposals and relevant past performance proposals can only be explained by the bias against and animus toward it on the part of an agency official. *See* App. A to Pl.'s Br.; Ex. A to Pl.'s Reply.[3]

In its criticisms of the evaluation process, plaintiff extends its scrutiny down to the level of individual evaluator worksheets to highlight what it believes are arbitrary determinations. *See, e.g.*, Pl.'s Br. at 41-46. But the relevance of such individual opinions depends on the evaluation process followed by the government. In reviewing procurement decisions for "a clear error of judgment," *Overton Park*, 401 U.S. at 416, the Court must determine if the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made." *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983) (citation omitted). By necessity, the Court must determine *who* was responsible for the choice and *what* information was relied upon in the decision, prior to determining the relevance of any material in the record. *See Beta Analytics Int'l, Inc. v. United States*, 67 Fed. Cl. 384, 396 (2005).

Under the FAR, of course, the ultimate responsibility for determining which proposal provides best value to the government rests with the source selection authority ("SSA"). 48 C.F.R. § 15.303(b)(6). Although the source selection decision represents his "independent judgment," the SSA "may use reports and analyses prepared by others" in reaching this

---

[3] Although the complaint states that the various allegations also amount to a breach of the implied contract to fairly and honestly consider proposals, *see* Compl. ¶¶ 61, 69, plaintiff appears to have dropped that theory from the case in its briefing on the motion for judgment and focuses solely on the APA standard of review, which applies in bid protests brought under the ADRA. *See* Pl.'s Br. at 24-25. Plaintiff also alleged that the Coast Guard violated the Public Integrity Act, 41 U.S.C. § 423(a). *See* Compl. ¶¶ 72-74. This allegation, which rested primarily on the contention that information was surreptitiously passed along to CHC during an "Industry Day" site visit, *see id.* ¶¶ 39-45, was also not included in plaintiff's merits briefing, and plaintiff's counsel conceded during the hearing that it was abandoned in light of the rebuttal contained in the declaration of Mr. Dawson. March 1, 2011 Transcript ("Tr.") at 88-89; *see* Attach. 3 to Def.'s Mot. for Leave to Supp. Admin. R. (Dawson Decl.).

judgment, and the FAR recognizes that the "business judgments and tradeoffs" of others may be "relied on by the SSA." 48 C.F.R. § 15.308; *see USfalcon*, 92 Fed. Cl. at 453. The SSA is required to establish an evaluation team possessing the appropriate expertise, 48 C.F.R. § 15.303(b)(1), and must ensure that evaluations are "based solely on the factors and subfactors contained in the solicitation." 48 C.F.R. § 15.303(b)(4). But the manner in which the SSA employs his team of experts, including the amount of delegation, is up to the SSA. He might adopt a source selection plan, for instance, which provides that he will follow the individual evaluations of the technical team members, rather than his own or a consensus view. *See Beta Analytics*, 67 Fed. Cl. at 397 (employing an SSP under which the average of evaluators' scores was taken to be the score for purposes of the best value determination). Under such an approach, the facts found by the individual evaluators figure directly into the source selection decision, and individual evaluation sheets must be scrutinized in order to determine if the ultimate decision was reached arbitrarily. *Id*. at 399.

On the other hand, when technical evaluations are reached by consensus, the views of any individual evaluators are not directly connected to the SSA's decision, making their worksheets less likely sources of support for the proposition that the decision was arbitrary. This is particularly true when the SSP stresses the independent basis of the SSA's decision, and the record indicates that the SSA was familiar with the content of the actual proposals. *See Fort Carson*, 71 Fed. Cl. at 583-84, 608-09. The worksheets of individuals might have a bearing on some discrete issues, such as the degree to which a consensus determination had been influenced by the views of allegedly biased team members. *See Pitney Bowes Gov't Solutions, Inc. v. United States*, 93 Fed. Cl. 327, 334-36 (2010). But whether the papers of individual evaluators should even be part of the administrative record will depend on whether the evaluation process included the concrete step of individual evaluations, the records of which must be maintained, *see id.*, or instead used evaluation ratings which from the start were the products of conference and consensus -- in which case any individual's notes are more akin to drafts that may be excluded. *See Gulf Group*, 61 Fed. Cl. at 347-48 (citing *Overton Park*, 401 U.S. at 420; *Domenico Garufi*, 238 F.3d at 1339).

The SSP for the tailoring services procurement called for technical evaluation by consensus, *see* AR at 253-57, and noted that the SSA was to "base the selection on an independent assessment utilizing all information available" and could seek advice from the evaluation teams "as needed." *Id*. at 257. The administrative record clearly establishes that the SSA took the "independent assessment" responsibility seriously, and utilized information in the actual proposals in performing his role. As plaintiff itself points out, *see* Pl.'s Br. at 18-19 & n.4; Tr. at 54, the SSA rejected the initial TET Evaluation Report, primarily because of "CHC correctable weaknesses in the proposal that had items that were not addressed in the first round of discussions and were not addressed in the TET Evaluation Report." AR at 588; *see also* AR at 632. The SSA's letter to CHC concerning the second round of discussions explained to the offeror: "During a second review of your proposal I noted some areas of weakness." AR at 607. While the SSP established an evaluation process in which each of the individual technical evaluators were to first record their findings on worksheets, AR at 254-55, and after reaching

consensus were to submit "all evaluation worksheets" to the SSA along with the consensus report, AR at 256, the weaknesses raised in the second discussion were obviously the product of the SSA's own scrutiny of the CHC proposal, as he states in the letter.  The individual evaluator worksheets had noted weaknesses in only one of the four subfactors with described weaknesses in the SSA's second discussion letter.  *Compare* AR at 607-08 (identifying weaknesses in the Performance Process, Equipment, Staffing Plan, and Accession Personnel Loading subfactors) *with* AR at 473-80, 498-506 (noting machinery missing from the proposal, AR at 477, 503).  Similarly, the minor matters raised in the second discussion letters sent to plaintiff and the other offeror in the competitive range were based on the SSA's review of these proposals, and were not recorded in the individual evaluator worksheets.  *See* AR at 486, 494, 512, 519, 603, 605.

Thus, the methodology followed in this procurement did not bind the SSA's decision to the consensus views of the TET, let alone the findings of the individual technical evaluators, and the record clearly demonstrates the SSA's diligence in personally reviewing the initial proposals and exercising independent judgment.  With this backdrop, we return to our preliminary question as to the relevance of views recorded in individual evaluators' worksheets.  The best value determination is contained in the "Competitive Price Negotiation Memorandum (PNM)/ Post Negotiation Business Clearance Memorandum" prepared by the Contract Specialist and approved by the SSA.  AR at 650-66.  In this document, the SSA relies on the technical evaluations received from the TET -- in the tradeoff analysis noting that "[t]he TET has found both proposals from CHC and TSI essentially equal for value offered with technical capability," AR at 665, and repeating nearly verbatim the language from the TET Report's comparison and recommendation section.  *See* AR at 638, 665.  Without question, then, the consensus evaluation of the TET must be reviewed for arbitrariness.  But does this require delving into the individual work papers?

The Court concludes no, for several reasons.  First, the worksheets contained in the administrative record reflect the reviews of the initial proposals, not of the revisions which emerged from the two rounds of discussions.  *See* AR at 473-89, 498-514 (evaluation reports dated Sept. 16, 2010).  Although the SSP required that proposal revisions were to be "evaluated and documented" using "the same process and procedures as used initially," AR at 257, and this process included submitting to the SSA all individual evaluator worksheets, *see* AR at 256, the SSA apparently did not see the worksheets from the second round of evaluations -- which have since been destroyed.  *See* Def.'s Second Status Report.  While this means the SSA could not have relied on the findings of either *individual* evaluator as to weaknesses, strengths, or other noted qualities of the final proposals, it is also somewhat problematic for Court review of the procurement decision.  Since individual evaluations were a concrete step in the technical evaluation process, these papers should have been included in the administrative record.[4]

_____

[4]  When an SSA's decision rests on the assumption that requirements of the SSP were followed by his subordinates, and the latter's failure to follow these requirements could have materially altered their evaluations, a Court may conclude that the agency acted arbitrarily.  *See* *USfalcon*, 92 Fed. Cl. at 452-55.  These circumstances are not present in the case at bar, as submission of the worksheets was a procedural requirement that had no impact on the consensus

But even had these worksheets been preserved and included in the administrative record, their contents would have had little bearing on this protest. This is due to the USCG's use of a consensus approach in the technical evaluation. The purpose of court review of a procurement decision is not to decide whether, in the court's estimation, the best offeror won, but rather to determine if a reasonable basis exists for the agency decision. *See Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1371 (Fed. Cir. 2009) (explaining that it is irrelevant whether the reviewing court "might, as an original proposition, have reached a different conclusion"). In other words, the question is whether the offeror whose proposal the government reasonably thought was best won. If the agency were to misunderstand factual information in a proposal that is not open to interpretation, or make findings that are internally inconsistent, then its award decision may not reflect what its opinion would have been absent these discrepancies. Accordingly, the Court looks at the *why* behind the agency decision, "verifying that objective elements contained in the agency's analysis, such as the description of the offeror's narrative, correspond to the evidence in the record, . . . and checking to see if subjective judgments are reached elsewhere in the analysis that contradict the evaluators' conclusions, . . . making the decision too 'implausible.'" *USfalcon*, 92 Fed. Cl. at 462 (citations omitted). When evaluations are the product of a consensus, a court could not say with confidence that the subjective judgments of any (or even all) individual evaluators truly contradict the conclusions of the team as a whole -- as even if each individual evaluator independently thought an aspect of a proposal was of one quality, after conferring the entire group could change its minds. *Cf. Fort Carson*, 71 Fed. Cl. at 604 (recognizing an agency's "prerogative to change its mind"). Thus, the individual worksheets would be, at best, very weak evidence of the arbitrariness of the SSA's decision.

Moreover, the Court notes that, in compiling the consensus report, the TET included a table which contains not just the consensus ratings for the technical proposal factor and subfactors but also the ratings of both of the individual evaluators. AR at 633. Such a process would tend to reduce the chances of a disconnect between the findings of the individuals and the views they expressed in reaching a consensus.[5] Finally, even in the unlikely event that the consensus report contains conclusions that are the opposite of the views of both individual members of the TET on any material issue, the evident engagement of the SSA in the review process, *see* AR at 603, 605, 607-08, supports the conclusion that he was personally familiar with the proposals when he chose to adopt the consensus view, making those subjective determinations his. In sum, the individual technical evaluation sheets that are in the record are not relevant to the best value determination, as they did not consider the final proposals; and the absence of the individual technical evaluation sheets relating to the final proposals is not, by

---

report and, were the SSA to have thought the worksheets important, their absence would have been obvious.

[5] It would also avoid the problem addressed in *Pitney Bowes*, 93 Fed. Cl. at 335, to the extent that the individual ratings could shed light on the bias of evaluators and its impact on the consensus.

itself, cause to doubt the reasonableness of the agency decision.[6]  The Court now turns to the specific areas of Tech Systems' protest.

### 1.  The Evaluation of the Technical Capability Proposals

For the tailoring services Solicitation, the Technical Capability factor was the more important of the two non-price factors.[7]  AR at 101.  After the second round of discussions, the TET gave Tech Systems and CHC the same overall factor rating of Satisfactory with Low risk. AR at 633.  The subfactor ratings for the two were nearly identical, with CHC receiving a Superior rating for its Staffing Plan; Tech Systems receiving a Superior rating under Equipment and an assessment of Moderate risk associated with its Staffing Plan; and all other ratings being Satisfactory with Low risk.  *Id.*  The TET found the proposals of these two offerors to be "essentially equal for value offered with technical capability."  AR at 638.  The SSA agreed with this assessment.  AR at 665.

Although both plaintiff and awardee received indistinguishable ratings from the evaluators, their technical proposals differed greatly in substance and style.  Plaintiff, the incumbent providing tailoring services at TRACEN, initially submitted a thirty-two page technical proposal volume (including a cover sheet and table of contents) replete with a corporate logo, seventeen photographs, and several tables.[8]  *See* AR at 307-38.  It begins with two pages containing an "Introduction" and "Contract Goals," AR at 310-11, and then covers each of the five subfactors, AR at 312-37, ending with a one-page conclusion.  AR at 338.  Except for the page covering the Equipment subfactor, AR at 324, each subfactor section contains multiple subheadings, and these sections range in length from two to twelve pages.  *See* AR at 336-37

---

[6]  For the same reasons that supported the supplementation of the record with its own declarations, plaintiff could have sought to depose the individual evaluators if it believed the consensus report did not accurately reflect their opinions, but chose not to do so.

[7]  The combined non-price factors were described as merely "more important than price." AR at 101.  Under the FAR and CICA, however, potential offerors are required to be told whether these are "*significantly* more important than, approximately equal to, or significantly less important than cost or price."  48 C.F.R. § 15.101-1(b)(2) (emphasis added); *see also* 48 C.F.R. § 15.304(e); 10 U.S.C. § 2305(a)(3)(A)(iii); 41 U.S.C. § 253a(c)(1)(C).  The Solicitation's statement of relative importance -- Technical Capability more important than Relevant Past Performance, and the two combined more important than Price -- ambiguously left open the possibility that Price was the most important factor of the three (i.e., Technical Capability could be 30 percent, Past Performance 25 percent, and Price 45 percent).  This provision is not at issue in this case, and would have required a challenge brought before the deadline for submitting proposals.  *See Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007).

[8]  An additional nine pages, in the form of a letter and an e-mail message, were submitted to revise the proposal after discussions.  *See* AR at 371, 376-83.

(Accession Personnel Loading); AR at 312-23 (Performance Process).  In short, the submission is recognizable as the usual proposal for a government contract, the type of professional product one would expect from a corporation, like plaintiff, which has won numerous government contracts.  *See* AR at 362 (describing experience).

Court House Cleaners' technical proposal, on the other hand, was a modest, unadorned product of a word processor, initially three and one-half and ultimately ten pages (counting four sample spreadsheets) in length.  *See* AR at 270-73, 289-94, 301-04.  About three pages were devoted to the Performance Process subfactor, AR at 289-92, while some subfactors received little more than a paragraph of text.  *See* AR at 292-93 (Staffing Plan); AR at 293-94 (Accession Personnel Loading).  Nothing but the subfactors is addressed in the proposal, and the proposal is worded in a concise, simple and straight-forward manner.  Consider, for instance, the Performance Process subfactor -- which the Solicitation defines as a description of "performance processes and systems from receipt of accession personnel for service events or unscheduled tasks to completion of alteration and/or tailoring services."  AR at 99.  The CHC proposal describes, in order, the steps from taking inventory of coats, distributing name tapes, sewing name tapes, and replacing coats on a rack, AR at 289; and the steps by which pants and coats are fitted, altered, and pressed -- including marking with chalk, pinking edges, and the order in which seams, sleeves, and buttons are adjusted.  AR at 289-91.

In contrast, plaintiff's proposal begins with an introduction that uses the word "process" several times, pledges TSI "will expertly manage the process," and explains the "process includes managing fluctuating workloads, strict adherence to USCG regulations and quality standards, precise inventory control, accurate record keeping, and effective communication."  AR at 310-11.  It then identified "Contract Goals" -- one paragraph which boils down to doing the work properly and on time, and another discussing how plaintiff "plans to embrace the concept of successful partnering with TRACEN representatives and contracting officials."  AR at 311. The Performance Process subfactor discussion begins with two sections, totaling a page and one-third, describing plaintiff's experience, including a summary of the work done on the incumbent contract.  The proposal then contains eight pages under the "Processes and Systems" heading, which breaks out work into subsections on measurements; marking for hems; fitting; special tailoring needs; the times required for alterations; and pressing; and adds a sentence on organization and a few sentences on record keeping.  AR at 313-20.  Tech Systems was careful to frequently use the words "process" and "system" in connection with its tasks, which included such details as whether recruits "stand in a line, facing forward," AR at 314, or "stand 'at relaxed attention' and with 'eyes on the boat.'"  AR at 315; *see also* AR at 316.  These processes and systems consisted of actions such as one person measuring and announcing data, which a second person records, AR at 314; measuring trousers and marking them with chalk, and using a "custom-made tool" to mark hem length, AR at 315; checking coats for chest, shoulder and back fit, length of coat and sleeves, and vent appearance, and sometimes trying different sizes, AR at 316; and identifying particularly short, tall, large and small recruits when they first arrive so they can be fitted for all uniforms at that time (a "process" that is described as trying on the closest fitting garments and seeing if these contain enough material).  AR at 317-18.  Plaintiff did not

initially include any of the steps involved in actually altering garments, which were among the revisions provided during the first round of discussions.  *See* AR at 376-79.

Because of the stark difference in approaches to the procurement, plaintiff is strongly of the opinion it is inconceivable that it could have received the same rating as CHC for Technical Capability.  *See* Pl.'s Br. at 36-41; Pl.'s Reply at 10-12.  It attributes this result to the evaluators' failure to understand the essential nature of the services being procured, and consequent deviations from the Solicitation requirements.  According to Tech Systems, *management* of the tasks to be performed was the primary requirement of the Solicitation.  Although the RFP described the procurement's purpose as being "to obtain Contractor furnished fitting, alteration/tailoring and garment pressing services," or "tailoring services" for short, AR at 51, 104, 212, plaintiff seemingly construed this to be a procurement to obtain the management of tailors.  Tech Systems bases this, in part, on the magnitude of services required, *see* Pl.'s Br. at 6; Tr. at 5, 10-11 -- proposals were to be priced based on tailoring for 3,415 male and 1,400 female Coast Guard recruits in the base year of the contract, and increasing by twenty-five percent for the four option years.  AR at 247-48.  This tailoring was to be estimated based on various tasks, such as sewing name tapes on coats 19,260 times, or hemming 5,745 men's trousers and 1,380 women's slacks.  AR at 186.  Offerors were provided a schedule for the arrival of recruits -- or an "Accession Personnel Loading Plan" -- showing recruiting events occurring during forty-four weeks of the fiscal year, with the number of personnel needing services (active or reserve Coast Guard recruits and Petty Officer trainees) varying from 60 to 150 per week.  *See* AR at 115-16.  Hence, plaintiff maintains the contract involves a lot of logistics and planning in order to perform the fluctuating amount of tailoring services.  *See* Pl.'s Br. at 6; Pl.'s Reply at 8.

Tech Systems also rests its claim that the evaluators misunderstood the nature of the contract on the designation of the contract as performance-based, and the fact that the contracting officer documented the finding that the contract was not for personal services.  Pl.'s Br. at 6-7, 30; Pl.'s Reply at 8-9; Tr. at 5, 9-12, 18; *see also* AR at 10 (non-personal services finding); AR at 107, 215, 236 (¶ 1.14 of PWS).  On this point, however, the Court does not find either of these to be significant.  The FAR requires the documentation of the non-personal services finding, 48 C.F.R. § 37.103(a)(3)(ii), and provides that performance-based contracting is "the preferred method for acquiring services."  48 C.F.R. § 37.102(a).  These routine aspects of government services contracts -- that the government will not directly supervise the work being performed, *see* 48 C.F.R. § 37.104(c)-(d), and does not tell the contractor how to achieve the result desired, *see* 48 C.F.R. § 37.101 -- do not invariably require a large amount of management or planning, and no case law to the contrary has been brought to the Court's attention.

The final piece of plaintiff's argument concerning the nature of the contract is based on the tasks to be performed under the RFP and the subfactor descriptions.  In this regard, the Court notes that Tech Systems does not appear to be contending that the Coast Guard's Solicitation "'entirely failed to consider an important aspect of the problem,'" *Ala. Aircraft*, 586 F.3d at 1376 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43), but rather that, properly construed, the RFP requires the technical proposal to contain a large amount of detail on corporate and project

management.  *See* Pl.'s Br. at 7-8, 14-15, 40-41.  Plaintiff cites such aspects of the PWS as the need for a "Project Manager," identified as one of the "key" personnel, Pl.'s Br. at 7, 14; *see also* AR at 212-13, 233-34, who is to provide quarterly progress reports summarizing work performed, *see* AR at 214, 235, and the mandate that the contractor "develop a quality control inspection system covering all contract services and assuring that all work will conform to contract requirements."  AR at 215, 236 (¶ 1.13 of PWS); *see* Pl.'s Br. at 7.  Tech Systems also contends that the Technical Capability subfactors require elaborate descriptions of management systems -- since offerors must demonstrate such things as "the performance processes and systems from receipt" of recruits "to completion of alteration and/or other tailoring services"; a "staffing plan . . . to provide the necessary staffing to perform alterations and/or tailoring" based on the events schedule; a "QC plan that shows the technical capability to provide a high quality of services and has procedures for accomplishing and verifying actions taken to correct noted deficiencies"; and "procedures to implement and manage significant volume variances" based on the schedule for weekly arrival of recruits and trainees.  *See* Pl.'s Br. at 13 (quoting from RFP's evaluation instructions, AR at 102).

Perhaps conditioned by its past experiences with competitive government procurements, Tech Systems read words such as "processes," "systems," "plan," and "procedures" and seemingly jumped to the conclusion that the Coast Guard expected the technical proposal to contain detailed discussions of management approach or corporate support.  But the PWS itself does not at all stress management functions.  The "Project Manager" was described as the "single point of contact" for the contract and "responsible for all work performed" -- but the contractor did not have to identify this person until five working days before the contract start date, and the stated qualification for the position was the ability "to read, write, speak and understand English."  AR at 212-13, 233-34 (¶ 1.3.1 of PWS).  The information required in the quarterly progress reports -- a summary of work performed, "including an assessment of technical progress, schedule status, and any Contractor concerns or recommendations for the previous quarterly period," AR at 214, 235 (¶ 1.10 of PWS) -- does not seem to imply the need for any particular management philosophy.  Nor does the need to keep track of such things as the running total of recruits served, payments received, or expenditures.  *See id.*  The quality control inspection system was described as something to be *developed*, AR at 215, 236 (¶ 1.13 of PWS), presumably while performing the contract.

Moreover, the "Requirements" section of the PWS does not contain one mention of the word "manage" or any derivation of it, instead discussing fitting, alteration, and tailoring services, garment-pressing and measuring.  *See* AR at 218-21, 239-42 (§ 5 of PWS).  The closest it comes to matters implicating management is the need to "coordinate changes to scheduled events with the COTR for approval" and to complete Made-to-Measure forms "in coordination with the COTR."  AR at 218-20, 239-41 (¶¶ 5.1.2, 5.1.8 of PWS).[9]  And the performance

_____

[9]  There is also an educational aspect of the requirements: "The flow of accession personnel through the tailoring shop for tailoring services will be supported by the Contractor to ensure the proper fit of uniforms that will lead to an understanding of uniform requirements by

requirements summary depicting "the deliverables considered by the Coast Guard to be ***most important*** for the successful performance of the contract" has three objectives -- meeting the Uniform Fitting and Alteration Manual guidelines 100 percent of the time; limiting negative impacts on the training schedule to no more than one in the base year and over every two option years; and not damaging, losing or misplacing uniforms.  AR at 222.  The progress reports are not mentioned, nor are the mechanics of the quality control system (as opposed to their fruits). *Id*.

Despite the absence of any emphasis on management in the PWS, plaintiff construes the technical proposal as if the exposition of management techniques was its purpose.  But the Coast Guard did not choose to include a management or corporate support factor or subfactor in the RFP, despite their common usage in government procurements.  *Cf. Bannum, Inc. v. United States*, 404 F.3d 1346, 1349 (Fed. Cir. 2005) (evaluating a management factor); *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1348 (Fed. Cir. 2004) (evaluating a "Supplier Capabilities-Management Capabilities" factor); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1317 (Fed. Cir. 2003) (evaluating a "Program Management and Integration" subfactor); *JWK Int'l Corp. v. United States*, 279 F.3d 985, 987 (Fed. Cir. 2002) (evaluating a management factor); *Fort Carson*, 71 Fed. Cl. at 574 (evaluating a management subfactor); *Beta Analytics*, 67 Fed. Cl. at 387 (evaluating a corporate support subfactor); *Orion Int'l Techs. v. United States*, 66 Fed. Cl. 569, 570 (2005) (evaluating a "technical/management" factor, containing a "proposed management plan" subfactor).  Tech Systems may have preferred that the evaluation proceed along the lines of the much-criticized "essay-writing contest,"[10] in which offerors are graded based on artificial abstractions:  the use of labels such as "process" and "system" to describe their ordinary work; the frequent invocation of pledges to "manage" well; and the packaging of obvious tasks into systematic lists.[11]  But the Coast Guard can hardly be faulted for focusing on the work offerors proposed to do, rather than the prose of their written proposals, in conducting a procurement for tailoring services.

Accordingly, the Court rejects plaintiff's contention that it was irrational for the Coast Guard to not have focused on management in evaluating offerors' technical proposals.  It may well be the case that Tech Systems is correct in believing that proper management is essential to performing the volume of tailoring work required by the contract.  But this is a matter left to the

---

accession personnel."  AR at 218, 239 (¶ 5.1 of PWS).

[10]  *See, e.g.*, Ralph C. Nash, *The Essay-Writing Contest: An Extreme Example*, 12 No. 9 Nash & Cibinic Rep. ¶ 46 (Sept. 2007); Vernon J. Edwards, *Streamlining Source Selection by Improving the Quality of Evaluation Factors*, 8 No. 10 Nash & Cibinic Rep. ¶ 56 (Oct. 1994).

[11]  A good example of the latter is found in plaintiff's Staffing Plan section, in which the hiring of personnel is broken down into ten bullet points containing such "functions" as recruiting, scheduling interviews, holding interviews, documenting interviews, checking references, and offering jobs.  *See* AR at 329.

discretion of the government, *see Ala. Aircraft*, 586 F.3d at 1376, which could reasonably believe that knowing how to tailor the garments to meet Coast Guard standards is the essence of the contract, and trust that a tailor with this experience can figure out how much effort is required to provide services for as many as 150 recruits per week.  Plaintiff's challenge to the Technical Capability factor ratings will be reviewed by scrutinizing the evaluations for objective inaccuracies or subjective inconsistencies.  *See USfalcon*, 92 Fed. Cl. at 462.  On this latter point, the Court determines that the SSA consistently followed the TET ratings of Satisfactory with Low risk for Tech Systems and CHC, accurately reciting (nearly verbatim) the relative advantages the TET found for each.  *See* AR at 638, 662, 665.  As these ratings were based on the TET's subfactor evaluations, the Court now turns to that aspect of the Technical Capability evaluation.[12]

### a.  Performance Process.

Under the Performance Process subfactor, both Tech Systems and CHC received ratings of Satisfactory with Low risk.  AR at 656-59.  The Satisfactory rating was defined as meaning a proposal "[m]eets all requirements" but "offers no significant benefits beyond the stated requirements," while containing "NO significant weaknesses or deficiencies."  AR at 259. Offerors were told in the RFP that in evaluating this subfactor, the government would look for the "[d]emonstrated understanding of the performance processes and systems from receipt of accession personnel for service events or unscheduled tasks to completion of alteration and/or other tailoring services."  AR at 102.

What the Coast Guard meant by"performance processes and systems" can be discerned from the TET evaluation of CHC's proposal.  The TET correlated "performance processes" with "tailoring," and "systems" with "tailoring events."  AR at 634, 658.  In other words, offerors needed to show they understood the various tailoring tasks that needed to be performed, in relation to the regular schedule by which recruits received these services.  Tech Systems'

---

[12]  The Court notes the presence of one apparent inconsistency concerning a subjective judgment about the overall level of risk, as the TET Report and the decision document repeat language from the rejected, initial TET Report that CHC "provided complete package where only their QA needed to be clarified and initially from the onset, set the bar," *see* AR at 594, 626, 635, 658; *see also* AR at 593, 657 (stating "CHC had the most complete proposal initially" but needed quality control details) -- which is hard to square with the weaknesses in four subfactor areas that CHC had to address in the second round of discussions.  *See* AR at 607-08.  Plaintiff argues this statement is proof the evaluators did not even bother to review the revised proposals for risk.  Tr. at 64-65.  But the inconsistency created by this careless cutting and pasting is about the qualities of CHC's first proposal, not the final revision upon which the award was made.  The record indicates that the TET did review the "supplemental technical information" submitted after the second discussion, specifically mentioning it and changing one rating (Staffing Plan) in response. *See* AR at 634, 658.

criticism of the Satisfactory rating given to CHC rests in large part on its theory, rejected above, that the RFP required extensive discussion of management philosophy.  *See* Pl.'s Br. at 30.

Plaintiff also lists several items that it identifies as "deficiencies" in CHC's proposal, several of which seemingly relate to this subfactor.  *Id*. at 38-40.  The Coast Guard used the FAR definition of a "deficiency," 48 C.F.R. § 15.001, which was paraphrased in the SSP as "[a] material failure of the proposal to meet a requirement or combination of significant weaknesses that increases the risk of unsuccessful contract performance to an unacceptable level."  AR at 254.  Of these two prongs, the Court notes that the second one does not lend itself easily to court review, except in the circumstance in which there is an internal inconsistency in the evaluation process -- a finding in one place of such a combination of significant weaknesses that is ignored elsewhere.  A court is hardly in a position to determine whether a proposal contains "a flaw that appreciably increases the risk of unsuccessful contract performance," 48 C.F.R. § 15.001 (definition of "significant weakness"), let alone whether a combination of these makes a proposal too risky -- unless it was to embrace with gusto the forbidden role of second-guessing the underpinnings of the evaluation process minutiae.  *See E.W. Bliss*, 77 F.3d at 449.  Under the first prong, however, it might be possible for a court to recognize the failure to meet a requirement, particularly if the requirement is both clear and clearly unaddressed in a proposal.

Even using the first prong and looking at PWS requirements, there are several problems with plaintiff's assertion of deficiencies related to Performance Process.  Several concern matters that are not mentioned in the PWS requirements, but are the product of plaintiff's focus on management -- such as "sewing efficiencies," ways to "prioritize work assignments," and several items about managing or management.  *See* Pl.'s Br. at 38-40.  Others find fault with CHC's failure to use the words "process or system" in describing work that is contained in the CHC proposal -- such as special tailoring, *see* AR at 290-91(subsumed in the alterations discussion, including "other special alterations" that would be "dealt with on a case by case basis"), record keeping, *see* AR at 301-04 (spreadsheets for keeping records), or pressing.  *See* AR at 290.  And one item is clearly mistaken -- the "[f]ailure to supply step-by-step instructions on how it planned to make alterations," Pl.'s Br. at 39, as CHC did address this in its proposal.  *See* AR at 290-91 (detailing alteration steps, including the order of stages from most to least difficult).  Plaintiff has not identified any basis on which the Court may determine that the Satisfactory rating for CHC was irrational.

Tech Systems also contends that it should have received the higher rating of "Superior" for this subfactor.  Pl.'s Br. at 15-17, 36-38.  This, though, essentially presents the flip-side of the second prong of the deficiency definition -- the Court is being asked to determine that plaintiff's proposal "[e]xceeds the requirements" in a way "which yields significant benefits to the Government."  AR at 259.  But whether services proposed offer "significant benefits" to an agency is a question that can really only be answered by the agency itself.  A court may, perhaps, look to see if a feature of a proposal that is found to yield these benefits has a close counterpart in another proposal that was, without explanation, not similarly credited.  Beyond that, a court would be indulging in second-guessing if it were to substitute its judgment for the agency's.

-25-

Moreover, plaintiff's argument is primarily that its experience and knowledge gained as the incumbent performing the contract is the reason it can provide significant benefits -- in other words, because it has met the requirements, it will exceed them. *See, e.g.*, Pl.'s Br. at 16 (noting "years of on-site experience" and "unique knowledge of USCG rules, regulations, and procedures"), 30 (stating proposal "outlined an extra value-added to the Government with its past experience in overcoming real world obstacles it has faced in performing the contract"), 37 (listing items including "performing the exact requirements set forth in the Solicitation in an exemplary fashion," its "extensive experience" tailoring military uniforms, its "intimate knowledge of rules and regulations of USCG," and its record of overcoming obstacles presented by the previous USCG contract). But if knowledge and experience gained on the job automatically translated into a "Superior" technical rating, and was so unique that "no local tailoring shops with a lack of prior experience providing these services for the USCG" can match it, *id*. at 37, an entrenchment of incumbents might well result. The Court is not willing to displace the judgment of procurement authorities with such a rule.

The TET explained that it found plaintiff's Technical Capability proposal "provid[ed] examples better left for evaluation under past performance" and initially left out descriptions of the actual altering of garments "as though the government should already have the requested evaluation factor information because of the incumbent status." AR at 635, 659. It noted one proposed uniform tailoring process "was seen as a minor weakness," but recognized that plaintiff had "the advantage in regards to their overall explanations of their performance processes related to managing systems." *Id*. The TET concluded the proposal overall "offered strengths but had no significant benefits beyond the stated requirements," meriting the rating of Satisfactory. *Id*. Clearly, the Coast Guard examined the Tech Systems proposal and "articulate[d] a satisfactory explanation for its" rating. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

The Court notes that much of what plaintiff cites as providing significant benefits to the Coast Guard was merely a recitation of past experience, often in the "essay-writing" style of over-elaborating on the obvious. For instance, the obstacles overcome included meeting an "unexpected surge by working extra hours and developing labor-saving shortcuts." AR at 322. But, to be sure, some elements of the Performance Process section of the proposal -- the comprehensive reporting log, AR at 321; the chart indicating the time needed to perform various alterations, AR at 319; maybe even the approach to special sizing needs, AR at 317 -- all appear to the Court to be beneficial and perhaps beyond requirements. But it would not be unreasonable for the Coast Guard to conclude that no significant benefit is provided by such details, as they may fall into the category of the type of things any contractor would figure out (or develop) while on the job. And plaintiff's proposal was unquestionably a well-written and well-constructed marketing tool. The purpose of review, however, is not to substitute the Court's judgment for that of the agency, particularly concerning technical evaluations. *See E.W. Bliss*, 77 F.3d at 449; *Weeks Marine*, 575 F.3d at 1371. For this subfactor, the Court cannot displace the Coast Guard's judgment.

### b. Equipment.

Plaintiff received a rating of Superior with Low risk for the Equipment subfactor, AR at 633, 636, 657, 659-60, as the TET found its incumbency provided  "a significant benefit to the government in that no time or government resources need to be expended to transition equipment in and out of the facility or do any other preparation to the working facility."  AR at 636, 659-60. Court House Cleaners received a Satisfactory rating with Low risk, AR at 633-34, 656, 658, as the TET concluded, after reviewing the "supplemental technical information to address the equipment offered and how CHC planned to meet the equipment requirement," that the "proposal demonstrated the capability to successfully meet the requirements of the prospective contract." AR at 634, 658.  The supplemental information referenced was CHC's response to the second discussion letter, which requested several details concerning the offeror's plan for the installation of equipment -- the schedule needed for installation; how equipment would be obtained; whether office furniture or computer equipment would be used; and the "risks for providing, installing and maintaining equipment."  AR at 607.[13]

In its final revised proposal, CHC explained that it had "2 options for equipping the tailor shop" -- either to buy Tech Systems' equipment, or "to use the current equipment" it had "and to purchase any other equipment new."  AR at 292.  The awardee indicated that equipment vendors could deliver new equipment "with two weeks' notice," and that "installation will have to be coordinated with" the Coast Guard.  *Id.*  It planned to accommodate "any delays" regarding "the pressing equipment installation" by sending uniforms to its dry cleaning facility for pressing.  *Id*. And it clarified that it "currently ha[d] office and computer equipment available for immediate use in the tailor shop."  *Id.*

Plaintiff criticized the evaluation of CHC's subfactor proposal, arguing that the proposal failed to state how long it would take to install and make equipment operational; did not name suppliers; provided no details about the dry cleaning operation; and was missing three pieces of equipment that were listed among the "representative" items previously used to perform tailoring services for the Coast Guard.  Pl.'s Br. at 31-32, 39.  But the "representative" equipment was not identified as a PWS requirement, *see* AR at 113, 117, 242, and the Court has no basis to conclude that the other criticisms reflect significant weaknesses or deficiencies, for the reasons explained above.  This subfactor was evaluated for the "[d]emonstrated capability to successfully meet the requirements of the prospective contract in terms of contractor furnished equipment (CFE) as it relates to the Offeror's performance of the tasks under the PWS."  AR at 102.  The Coast Guard evidently believed that the equipment proposed by CHC could perform the required tasks, and was satisfied that CHC knew how long delivery of new equipment would take and had a contingency plan in case one particular machine was delayed.  A reviewing court is in no position to find to the contrary.

---

[13]  The discussion letter also asked why only two racks were listed in the proposal.  AR at 607.  The SSA appeared to have been referencing the "Rolling Racks with Shelves," and overlooked the listing of twelve "Rolling Racks Single."  *See* AR at 273, 300.

-27-

### c.  **Staffing Plan.**

The Staffing Plan evaluation concerns the one subfactor for which the TET gave CHC a higher rating than plaintiff.  Court House Cleaners received a Superior rating with Low risk, while Tech Systems received a Satisfactory rating with Moderate risk.  *See* AR at 633, 656-57. The TET explained that, after discussions, the CHC proposal contained a "significant benefit to provide the necessary staffing with full-time employees."  AR at 634, 658; *see also* AR at 638, 665 (noting CHC's advantage of "full time staffing").  On the other hand, Tech Systems was assessed as presenting Moderate risk under this subfactor, "as some of their staff are part-time employees minimizing retention of their staffs [sic] effectiveness and expertise."  AR at 636, 660.

In the five-page Staffing Plan section of its proposal, plaintiff explained how, though a small business, it "effectively utilize[d] formal systems one might expect only from a larger business," AR at 325; described its management team and corporate structure, AR at 325-26; detailed corporate oversight of the tailoring shop operations, AR at 327; described the jobs of Project Manager, Tailors, and Sewing Machine Operators, AR at 327-28; and provided about one page of text on its recruitment plan, which included the idea of hiring incumbent and temporary workers and listed the normal steps of the hiring process.  AR at 328-29.  During the second round of discussions, the SSA told plaintiff that its proposal contained this weakness: "No staffing plan is provided for organization that will work on-site.  List should show quantity and type of positions."  AR at 605.  Plaintiff responded with an e-mail identifying the number of personnel proposed (seven in total), by category, and explaining the "positions are part-time and fluctuate based on the weekly requirements and recruit levels."  AR at 371.

Court House Cleaners' staffing plan identified the number of employees (six in total), by position, that it planned to employ "to run this operation," *see* AR at 292, and explained that four of the employees were already on their staff "on a part-time as needed basis."  AR at 293.  Those four were to be "increased to full time and rotated to Cape May as needed."  *Id.*  The offeror stated that it had contacted two other people "who would be hired upon the award of the contract," *id.*, and any further openings would be new hires -- for which the current tailor shop employees would be given the first opportunity, and "if any other positions need to be filled" CHC would "conduct a search for new hires through advertisements and word of mouth."  *Id.*

Plaintiff contends that CHC's proposal was deficient in not describing its management or organizational structure, and in allegedly not containing enough details about the status and availability of the new hires.  Pl.'s Br. at 32-33, 40.  Tech Systems also noted that CHC was proposing to use one fewer employee than it had proposed, *id.* at 33, and criticized the recruiting plan for lack of detail.  *Id.* at 40.  To plaintiff, the "bare-bones plan," Tr. at 53, was not really a plan at all, *see* Tr. at 22, 44-46, 52-54, and the proposed use of full-time employees was an inferior approach to Tech Systems' use of part-time employees.  Tr. at 67-69.[14]  But once again,

---

[14]  Plaintiff's criticism of the risk assessment is considered in a separate section below.

-28-

plaintiff would have the Court second-guess the technical judgments of the evaluators. As was explained above, the RFP did not require any detailed explanation of management approaches or organizational structure. And it was not unreasonable for the Coast Guard to determine that the information provided by CHC constituted a "plan that shows an understanding and capability to provide the necessary staffing to perform alterations and/or tailoring for the accession loading plan." AR at 102. The Coast Guard found that CHC's plan to staff the tailoring shop with employees that it employed on a full-time basis, but assigned to the shop only part of the time, provided the government a significant benefit over the use of part-time employees. AR at 634, 658. This articulated judgment does not misstate the plan of CHC, *see* AR at 293, and is not the sort of determination a court may second-guess. *See E.W. Bliss*, 77 F.3d at 449. Finally, the Court does not agree with Tech Systems' contention that CHC's proposal is deficient for failure to engage in an "essay-writing contest" in which every obvious step involved in recruitment and hiring is spelled out and embellished, or for not providing letters of commitment for people to work in a tailoring shop. There was no requirement that offerors identify their Project Manager in their proposal, let alone every sewing machine operator or presser. *See* AR at 233-42. The Court does not find the Staffing Plan ratings to be arbitrary.

### d.  Quality Control Plan.

For the Quality Control Plan subfactor, both plaintiff and CHC received a Satisfactory rating with Low risk. AR at 633-36, 656-58, 660. The TET noted that CHC had "the advantage" regarding its "quality control documentation process." AR at 638, 665. Under the RFP, this subfactor was evaluated for a "[d]emonstrated QC plan that shows the technical capability to provide a high quality of services and has procedures for accomplishing and verifying actions taken to correct noted deficiencies." AR at 102.

Plaintiff's challenge to the Coast Guard's evaluation of this subfactor amounts to another request that the Court substitute its judgment for that of the contracting officials. *See* Pl.'s Br. at 33-35. Tech Systems contends that the Quality Control Plan of CHC was so spare that it should not even be considered a plan, as it allegedly lacked in-place procedures. *See* Tr. at 30-31, 46-47. But CHC proposed an inspection of one hundred percent of garments tailored, identifying what would be checked on pants, shirts, and dress coats, and promising immediate correction. AR at 293. It also described a process addressing "deficiencies found after delivery," which would be logged on a Deficiency Spreadsheet that was attached to the proposal. AR at 293, 301. And it described how damaged items would be tracked. AR at 293.

Admittedly, plaintiff's four-plus page section on Quality Control was longer and more detailed. *See* AR at 330-34; *see also* AR at 379-82 (discussion response with procedural steps and sample forms).[15]  Among other things, it identified the Project Manager as its Quality

---

[15]  The section also included a page and one-third of text on matters that are not directly related to Quality Control, such as plaintiff's compensation plan, retention of employees, and employee incentives. *See* AR at 334-35.

Control Inspector, who would "continually evaluate progress, efficiency, and work quality."  AR at 330.  The proposal included monitoring by an official at the corporate level, AR at 330-31, having employees report substandard work by their colleagues, AR at 332, at least two unannounced Quality Control assessments per month, and continuous safety and sanitary reviews. AR at 333.  One notable, but potentially costly, aspect of the proposal was the use of a "Quality Bonus Pool" to reward workers for useful suggestions and innovations, although these are not necessarily tied to levels of tailoring quality.  *See* AR at 331.  For the same reasons described earlier, though, the Court is in no position to determine that Tech Systems' approach to Quality Control provided significant benefits to the government, to merit a higher rating than Satisfactory.  And while the Coast Guard found the rather simple deficiency form of CHC to be a noted feature, this was not enough to make a difference in its rating, which was also Satisfactory.  *See* AR at 634, 638, 658, 665.  The criticisms of plaintiff concern subjective judgments of the quality of the proposals, which courts may not second-guess.  *See E.W. Bliss*, 77 F.3d at 449.

### e.  Accession Personnel Loading.

The TET gave both plaintiff and CHC a Satisfactory rating with Low risk for the Accession Personnel Loading subfactor.  AR at 633, 635-36, 656-57, 658, 660.  This subfactor was evaluated to determine if offerors "[d]emonstrated procedures to implement and manage significant volume variances" according to the recruits' training schedule.  AR at 102.  Tech Systems addressed this subfactor in two pages, explaining what it has done in the past at TRACEN -- such as bringing in extra equipment, hiring extra workers (including seasonal crews), and working employees overtime.  AR at 336-37.  Court House Cleaners provided one paragraph, explaining that it would utilize full-time employees at both TRACEN and its other location, would cross train employees so multiple back-ups exist, and rotate employees between the two locations based on the work load.  AR at 293-94.

Plaintiff contends that the CHC proposal is deficient in not explaining how it will manage an increase in demand at its other location when it needs the employees at TRACEN, and for failing to appreciate the increased number of employees needed for surges at TRACEN.  Pl.'s Br. at 36, 40; Tr. at 67-68.  But taking the information in the Staffing Plan and this subsection together,[16] CHC proposes to dedicate six of its full-time employees to the TRACEN tailoring shop as needed, which is "most" (but not all) of its employees, and rotate personnel between the two locations.  AR at 292-93.  Tech Systems proposes to use seven part-time employees, AR at 371, whose hours will be increased and supplemented with temporary hires when needed.  AR at 329, 337.  Thus, under either approach, some indeterminate number of full-time employees, greater than six, will be used to deal with surges -- CHC's coming from its other location, and plaintiff's from hires.  Whether either approach is deficient, provides significant benefits, or (as the agency determined) meets requirements is a question of judgment on a technical matter that the Court cannot take away from an agency.  *See E.W. Bliss*, 77 F.3d at 449.

---

[16]  The RFP informed offerors to "present details in only one area of the proposal" and to "not keep repeating the same details in other areas of the proposals."  AR at 99.

**f. Risk assessments.**

In its motion for judgment, plaintiff challenged the over-all assessments of risk under the Technical Capability factor, focusing on matters within several subfactors. *See* Pl.'s Br. at 46-48. Both it and CHC received a Low risk assessment for the factor. *See* AR at 633, 635-36, 656-60, 665. The assessment of Tech Systems was attributed, in part, to its being "the incumbent contractor with staff, equipment and an understanding of processes in place to mitigate risk." AR at 636, 660. In the assessment of CHC, the TET unfortunately repeated language from its initial report, rejected by the SSA, to the effect that the CHC proposal was the "complete package" with only Quality Control to be clarified, and "initially from the onset, set the bar." AR at 635, 658; *see supra* note 12. Plaintiff argues that this shows that the TET did not evaluate the final proposal revision of CHC for risk. Tr. at 64-65. But the TET noted the "supplemental technical information" submitted after the second round of discussions, specifically identifying the areas of "Performance Process, Equipment and Staffing," AR at 634-35, 657-58, and plaintiff itself concedes the evaluators were apparently aware of the Accession Personnel Loading revision. *See* Tr. at 68. Considering that the SSA, who was engaged enough in the process to have noticed the need for the additional information himself, *see* AR at 607-08, ultimately approved of the TET's judgment and made it his own, *see* AR at 665-66, there is no reason to doubt the TET's statement that it conducted "a second review of the proposal[s] following discussions" and reached consensus on the "degree of risk assessed for each Offeror." *See* AR at 632, 656.

Concerning the rationality of the assessment of Low risk for CHC, plaintiff contends that it is "illogical that a company such as CHC, which has to finance the purchase of new and expensive equipment, hire all new workers, train those workers, and develop extensive procedures" received such an assessment.[17] Pl.'s Br. at 47; *see also* Tr. at 43-46. It also repeated its contentions that CHC really had no plan for quality control, staffing, or dealing with surges, all creating at least some risk for the performance of the contract. Tr. at 49. But whether such aspects of a proposal as the need to obtain equipment poses "little potential to cause disruption of schedule, increase in cost, or degradation of performance," meriting an assessment of Low risk, or instead "can potentially cause some disruption of schedule, increase in cost, or degradation schedule," requiring "special contractor emphasis and close government monitoring" and warranting a Moderate risk assessment, *see* AR at 264, is not the sort of judgment that a court may second-guess. *See E.W. Bliss*, 77 F.3d at 449. Moreover, plaintiff recognizes that it is wholly proper for a government agency to have a high tolerance for risk, and in the best value tradeoff determine a lower price was worth a higher risk. Tr. at 57. In a related vein, the Court does not see why a particular agency would not be allowed to have a lessened sensitivity to risk, and reasonably hold the opinion that certain possibilities did not really jeopardize performance. With no subjective inconsistencies or objective inaccuracies identified in the record, the Court

---

[17] In this criticism plaintiff misunderstood the CHC proposal concerning staffing, as CHC already had at least four of the employees proposed for the contract on its staff. *See* AR at 293.

cannot find the Coast Guard's assessment of risk to be arbitrary.  *See USfalcon*, 92 Fed. Cl. at 462.

### 2.  The Evaluation of Relevant Past Performance

Under the Relevant Past Performance factor, both Tech Systems and CHC received a rating of Superior, *see* AR at 540, 543, 664-65, which under the SSP equates to a finding that "[p]ast performance exceeded requirements."  AR at 260.  Plaintiff's Relevant Past Performance proposal contained four references for contracts to provide fitting and alteration of military uniforms, with contract values ranging from $1.2 million to $8.2 million and services provided to between 1,000 and 35,000 individuals annually, AR at 363-66; and two U.S. Marine Corps contracts to repair over 200 pieces of fabric and non-fabric military equipment weekly, each contract exceeding $800,000 in value.  AR at 367-68.  Court House Cleaners' Relevant Past Performance proposal contained four references: one was a contract to perform custom tailoring of four tactical vests for the Coast Guard, AR at 279, 282; one was a contract to alter and repair garments for a commercial establishment, valued at $5,000 annually, AR at 279-80; and two were for performing personal tailoring of the uniforms of two Coast Guard officers.  AR at 280-81.  Letters of reference were provided by the business's owner and the two individuals.  AR at 283-85.

Plaintiff argues that the past performance evaluation lacked a rational basis, contending the Coast Guard did not analyze the relevance of CHC's references to the PWS requirements or explain how that small-scale work could compare to the size and complexity of the tailoring services contract.  Pl.'s Br. at 49-53.[18]  Although the Court considers this a close question, it concludes that the great deference and discretion an agency is given to determine the relevance and quality of an offeror's past performance will not allow this aspect of the evaluation to be disturbed.  *See, e.g., PlanetSpace, Inc. v. United States*, 92 Fed. Cl. 520, 539 (2010) (holding that "the 'especially great discretion' that contracting officials enjoy in the context of negotiated

---

[18]  In its reply, Tech Systems also argues that the Coast Guard violated the FAR provision stating that "[t]he source selection authority shall determine the relevance of similar past performance information," Pl.'s Reply at 13 (quoting 48 C.F.R. § 15.305(a)(2)(ii)), as the evaluations were conducted by the past performance evaluator, not the SSA.  Even if such an issue can be raised in a reply, *cf. Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (finding an argument waived when not included in "principal summary judgment brief," in order "to give a trial court a fair opportunity to rule on [the] issue"), the Court finds this argument unavailing.  Unlike the source selection decision, which the FAR explicitly states as requiring the SSA's "independent judgment," 48 C.F.R. § 15.308, the past performance provision includes no language indicating this determination may not be delegated to the evaluation team the SSA is required to establish.  *See* 48 C.F.R. § 15.303(b)(1).  Here, the plan approved by the SSA assigned the evaluation task to one individual, *see* AR at 251, 256, and his findings were adopted and approved by the SSA, *see* AR at 664-66, satisfying the SSA's required involvement in the determination.

procurements" extends to past performance determinations); *Fort Carson*, 71 Fed. Cl. at 598-99 (noting that the greatest deference possible is given to past performance evaluations); *Gulf Group*, 61 Fed. Cl. at 351 (same); *SDS Int'l v. United States*, 48 Fed. Cl. 759, 771 (2001) (noting the great discretion given to procurement officials in this area); *Seattle Sec. Servs., Inc. v. United States*, 45 Fed. Cl. 560, 567 (2000) (explaining that agencies "are generally given great discretion in determining what references to review").

First, while the FAR requires that the "currency and relevance" of past performance information "shall be considered" in these evaluations, 48 C.F.R. § 15.305(a)(2)(i), and that the solicitation "shall describe the approach for evaluating past performance . . . . and shall provide offerors an opportunity to identify past or current contracts . . . for efforts similar to the Government requirement," 48 C.F.R. § 15.305(a)(2)(ii), the FAR does not dictate how relevance or similarity is to determined. There are innumerable ways in which past performance may be relevant -- including, for instance, the type, volume, and speed of work performed -- and "the FAR does not require the agency to distinguish between relative degrees of relevance." *Univ. Research Co. v. United States*, 65 Fed. Cl. 500, 508 (2005). Only a "threshold level of relevance" is required, *id.*, although an agency could bind itself to a particular approach to determining relevance in the RFP, making particular qualities (such as size of contract) necessary ingredients to the determination. While an agency is certainly free to give more weight to contracts that are more relevant to the work being procured, *see Forestry Surveys & Data v. United States*, 44 Fed. Cl. 493, 499 (1999), and could make contract size dispositive for relevance, there is no external requirement that it do so.

Plaintiff, however, argues that the RFP imposed an internal requirement on this process, by informing offerors that the "evaluation will focus on the size, scope and complexity of the efforts, the degree of relevance to the PWS, the extent to which performance measures and service level metrics were applied to specific program objectives, and the actual results achieved against these measures." Pl.'s Br. at 50 (quoting AR at 103). The SSP, to be sure, repeated verbatim this charge, *see* AR at 259, but then added four subfactors to be evaluated, that were unmentioned in the RFP: Product Quality, Timeliness, Cost Control, and Customer Satisfaction. *Id*. The SSP also included a questionnaire, to be used by the past performance evaluator, *see* AR at 256, designed to elicit responses (using a scale from 0 to 10) from references relating to the four SSP subfactors. AR at 268. Plaintiff contends that these questions did not address size, scope, complexity, or relevance to the PWS, and that the Coast Guard thus departed from the stated RFP criteria. *See* Pl.'s Br. at 52-53 & n.11; Tr. at 33.

While this evaluation approach raises legitimate concerns, an injunction against a contract award must be based on a clear violation of the FAR. *See Domenico Garufi*, 238 F.3d at 1332. Given the great discretion that agency officials receive in this area, *see PlanetSpace*, 92 Fed. Cl. at 539, the Court cannot conclude that such a clear violation has been shown. Most of the questions from the questionnaire concerned quality, timeliness, or cost control, which are all items which appear to come under the "performance measures and service level metrics" and "actual results achieved" areas of focus identified in the RFP. *See* AR at 103. The Relevant Past

Performance proposal was described in the RFP as serving the purpose of "demonstrating capability and capacity to deliver high quality service and solutions for the tasks and requirements within the PWS," AR at 100, and most of the questions from the questionnaire certainly relate to that function.  While the four Past Performance subfactors were not identified in RFP, the Court cannot conclude that they were of such significance that they needed to be.  *See* 48 C.F.R. 15.304(d) (requiring only "significant subfactors" to be stated in solicitations).  The source selection decision document indicates that the past performance evaluator did not base his rating solely on the questionnaires, but also on "a review of the submitted past performance reference data."  AR at 664.

Since none of the areas of focus described in the RFP for the past performance evaluation were identified as subfactors or given any decisive weight, *see* AR at 103, the Court cannot conclude that the use of a questionnaire emphasizing only some of these areas and neglecting others was a departure from the RFP criteria.  Moreover, it may well be the case that the other areas of focus, such as size and complexity, or degree of relevance to the PWS, are matters that are considered obvious from the face of the proposal itself and do not need a questionnaire for their determination -- in other words, the evaluator may know it when he sees it.  *Cf. Jacobellis v. Ohio*, 378 U.S. 184, 197 (1964) (Stewart, J., concurring) (employing an "I know it when I see it" test in a decidedly different context).

Plaintiff contends that CHC's past performance should have been deemed irrelevant, requiring a neutral rating, Pl.'s Br. at 49-52 (citing 48 C.F.R. § 15.305(a)(2)(iv)), since none of the references involved contracts of the scale of this procurement.  *See id.* at 52.  But while size and scope may be considered aspects of relevance, they need not be -- and the RFP, the Court notes, distinguished between them and "degree of relevance to the PWS," listing both as areas of focus.  AR at 103.  The PWS for this procurement concerned the tailoring of Coast Guard uniforms, *see* AR at 239-42, and fifty-seven pages of the RFP were dedicated to descriptions of these garments and their proper fit.  AR at 118-74.  Three of the CHC references concerned the tailoring of Coast Guard garments.  *See* AR at 279-81.  A letter of reference from a Captain in the Coast Guard stated he was familiar with the work of CHC's owner for six years, during which time "she has consistently demonstrated a highly professional demeanor and commitment to many of the active duty members in the Cape May Area."  AR at 283.  He found that "[h]er knowledge of uniform regulations and attention to detail is equally impressive," and explained that "[o]n numerous occasions [she] has willingly stepped up to complete uniform alterations on short notice for many of our active duty members," with the result being "a sharp military appearance in uniform" that "is unparalleled."  *Id.*  Another letter of reference stated that the author, a former Command Master Chief of the TRACEN, was familiar with CHC's work for three years, and considered its owner "a subject matter expert on the Coast Guard's Uniform Tailoring requirements" -- as CHC tailored "the entire spectrum" of his uniforms "quickly and to [his] complete professional satisfaction."  AR at 285.

These references were unquestionably relevant to the PWS requirements, and the administrative record shows that the past performance evaluator reviewed them.  *See* AR at 538-

41, 553-59, 664.  The fourth reference did not involve tailoring Coast Guard garments, but involved tailoring civilian jackets, shirts and pants for a commercial entity.  *See* AR at 279-80.  Its owner wrote that CHC has been performing this work under contract since 2004, and the work has been "dependable, consistent and on time without any flaws."  AR at 284.  This would appear to be relevant to performance standards identified in the PWS -- that the work meet requirements 100 percent of the time and be performed in a timely manner.  *See* AR at 243.  The past performance evaluator obviously found this commercial contract relevant to the procurement.  The evaluation of the factor under the RFP was to "examine the extent to which the Offeror's *relevant* past performance demonstrates their [sic] capability and capacity to deliver high quality service and solutions for the tasks and requirements within the PWS."  AR at 103 (emphasis added).  While the evaluator did not expressly state that this, or any, experience was found to be relevant, he requested that the business respond to the questionnaire -- and it did, giving CHC scores of "10" across-the-board.  AR at 541.

An agency is not generally required to provide a detailed explanation of the reason why past experience is considered relevant, or to make findings of relative relevance.  *See Westech Int'l, Inc. v. United States*, 79 Fed. Cl. 272, 294 (2007).  Implicit in the evaluator's consideration of a reference is that it has already been deemed relevant for purposes of evaluating past performance.  The wrinkle here is that the RFP informed offerors that the evaluation would "focus" on such considerations as "the size, scope and complexity of the efforts" and "the degree of relevance to the PWS."  AR at 103.  Since these are not expressly identified as subfactors, however, the Court concludes that this instruction imposes no duty on the agency to articulate findings relating to those specific considerations -- as "inquiry into the mental processes of administrative decisionmakers is usually to be avoided."  *Overton Park*, 401 U.S. at 420 (citing *United States v. Morgan*, 313 U.S. 409, 422 (1941)).  Had the RFP deemed those considerations subfactors to be evaluated, or confined relevance to work of the same size and scope, the answer might be different.

The Court cannot presume that the evaluator forgot the identified areas of focus when he performed his evaluation.  And given the nature of CHC's references, he had to recognize that the work was not at all close in size to the work to performed under the tailoring services contract.  But nothing in the FAR, the RFP, or even the SSP would preclude CHC from receiving a "Superior" rating for work that was not of the size of that being procured.  That was a choice within the Coast Guard's discretion.

The past performance evaluator wrote that CHC had "a well-built rapport with the local community, good references, and [a] solid past performance submittal package."  AR at 539.  He noted its "previous experience with tailoring and alterations for the United States Coast Guard," found it had "proven ongoing schedule commitments with good results," and highly recommended it, "believ[ing it] can perform scope of work for the contract to its maximum capability."  *Id.*  He explained the factor rating of Superior, finding "[t]he past performance of work has been shown to exceed the requirements," AR at 540; that CHC "is a solid company with an excellent record of productivity and no exposed flaws," *id.*; and that it "seems to be fully

capable of performing all work with excellent results as noted by several recommendations included in [the] submission package." *Id*. The source selection decision document agrees with his findings, noting the average score of 10 on the one survey and the finding by the evaluator, after a "review of the submitted past performance reference data," that the "reference material [was] superior." AR at 664.

Thus, the agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. One might, perhaps, disagree with the evaluator's conclusion that the "scope of work" could be performed by CHC (unless scope meant merely the range of tasks involved),[19] but a "court is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416. The evaluation of CHC's past performance did not involve an objective inaccuracy, such as a finding that CHC's references were for contracts of the same size as this procurement. Nor were there any subjective inconsistencies, such as a finding that identical experience was relevant for one offeror but not another. Particularly given the great deference and discretion that agencies receive for past performance evaluations, *see PlanetSpace*, 92 Fed. Cl. at 539; *Fort Carson*, 71 Fed. Cl. at 598-99, the Court cannot find the evaluation of CHC to have been performed arbitrarily or unreasonably.

### 3. The Treatment of Price in the Evaluation Process

In its Notification of Award Letter, the USCG informed plaintiff that "price was used as the determining factor for award." Pl.'s Br. at 55. Plaintiff alleges that the USCG did not hold meaningful discussions because the agency never notified it that its high price was a weakness that may prevent it from receiving the award. *Id*. According to Tech Systems, the TET had concluded that Tech Systems and CHC were equal in technical capability by September 28, 2010. Pl.'s Br. at 56. Therefore, plaintiff argues, the USCG was aware that price would be the deciding factor before the second round of discussions on October 7. *Id*. In Tech Systems' view, the USCG identified relevant weaknesses in CHC's proposal but refused to discuss price with Tech Systems, thus violating the provision of the FAR which prohibits the favoring of one offeror over another. Pl.'s Br. At 58 (citing 48 C.F.R. § 15.306(e)).

The FAR requires contracting officers to discuss "deficiencies, significant weaknesses, and adverse past performance information" with offerors still being considered for award. 48 C.F.R. § 15.306(d)(3). As defined by the FAR, a weakness "means a flaw in the proposal that increases the risk of unsuccessful contract performance," while a "significant weakness" is "a flaw that appreciably increases the risk of unsuccessful contract performance." 48 C.F.R.

---

[19] The Court notes that the PWS paragraph on the "Scope" of the procurement describes the "purpose" of the contract ("to obtain Contractor furnished fitting. alteration/tailoring and garment pressing services . . . for Accession Personnel") and its length ("a base year and (4) annual option years"), but does not address the number of trainees to be served. AR at 104, 233 (¶ 1.1 of PWS).

-36-

§ 15.001.  Plaintiff has failed to demonstrate that Tech Systems' price was considered a "weakness" by the agency, let alone a "significant weakness."  Without showing how its price proposal was a significant weakness, plaintiff cannot establish that discussions on price were necessary under the FAR.

In arguing that a discussion concerning price was required because it was the "sole basis for not selecting TSI," Pl.'s Br. at 58, plaintiff ignores the distinction between a "weakness" in the proposal that would risk unsuccessful contract performance and areas in which competitors have a mere advantage.  The contracting officer "is not required to discuss every area where the proposal could be improved."  48 C.F.R. § 15.306(d)(3).  On the subject of price, the FAR permits but does not require discussions with offerors.  48 C.F.R. § 15.306(e)(3).  The USCG may inform an offeror "that its cost or price is considered to be too high or unrealistic," but the agency "has no responsibility to inform an offeror that its cost or price is high where the offeror's cost or price is not considered excessive or unreasonable."  *Banknote Corp.*, 56 Fed. Cl. at 385.

The SSP provided for a price proposal evaluation by comparing offerors' proposals to price data from the IGCE.  AR at 256.  In the Price Evaluation Report, the Contract Specialist considered the plaintiff's offered price to be "approximately [XX]% less than the IGCE"; he further stated that "[t]here is no reason to take exception to this competitively offered pricing."  AR at 641.  The Price Evaluation Report did not label plaintiff's price proposal as excessive, unreasonable, or a significant weakness.  Based on the price evaluation, the agency was not required by the FAR to conduct discussions on price with plaintiff.

Plaintiff further alleges that the discussions were "patently misleading" because the agency asked for more technical detail instead of discussing price.  Pl.'s Br. At 56.  According to plaintiff, the agency declined to discuss price when plaintiff had "specifically inquired whether its price was competitive."  *Id.* at 56 n.12; *see* Compl. ¶ 29.  Furthermore, plaintiff argues, the discussions with it were misleading because the agency did not allow it to address the determination that its approach placed too much emphasis on its management, which allegedly kept Tech Systems from reducing its overall price.  Pl.'s Reply at 17-20 .

Plaintiff bases this latter argument on *Gentex Corp. v. United States*, 58 Fed. Cl. 634 (2003).  In *Gentex*, the solicitation imposed expensive requirements for a battery solution.  *Id.* at 650.  The agency, however, advised one offeror that it could conduct a "cost as an independent variable" tradeoff during the pre-award evaluation phase to offset noncompliance with the threshold technical requirements.  *Id.*  At the same time, the agency reinforced Gentex's misunderstanding that the RFP required full compliance with the battery solution specifications.  *Id.* at 652-653. Our court found that the agency had held misleading discussions when it knew that plaintiff's interpretation of the RFP was contrary to its own interpretation and that of a successful offeror.  *Id.* at 653.  "[W]here an agency fails to resolve an ambiguity during discussions which should have been reasonably detected and which materially prejudices an offeror, the agency has failed in its obligation to conduct meaningful discussions."  *Id.* (citations omitted).

-37-

Plaintiff frames its discussions with the agency as a failure to address its high-cost, management-centric approach, but the record does not support the application of *Gentex* to this case. Unlike the agency in *Gentex*, the USCG did not waive a specification for one offeror but not the other. As was discussed above, the PWS contained no management-related requirements, and did not employ a management evaluation factor. Though Tech Systems argues that the USCG knew it was mistaken about the importance of management and failed to correct its understanding, plaintiff has not demonstrated that it offered a higher price because of the management aspects of its technical approach. The administrative record does not show that plaintiff's emphasis on management was behind any extra costs in its proposal -- to the contrary, Tech Systems claimed in its proposal that because it "effectively utilize[s] formal systems one might expect only from a larger business" it was "able to streamline processes, reduce cost and maximize the Government customer's resources." AR at 325.

Plaintiff, moreover, should have been alerted by the RFP that "price could become a determining factor" when proposals were technically equal. AR at 101. Though Technical Capability and Relevant Past Performance were more important than price when combined, the RFP also said that price could be the deciding factor when two proposals were technically equal. *Id.* In making the source selection decision, the Contracting Officer noted that CHC and Tech Systems were equal in technical capability and past performance, so CHC offered the best value with its lower price. AR at 665. This best value determination was consistent with the RFP.

While it appears to be the case that the expression of the relative weight of price and non-price factors in the Solicitation did not conform to the required language from the FAR, as it failed to specify whether these were *significantly* more or less important or approximately equal, *see supra* note 7, this constitutes a patent ambiguity. As "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process," plaintiff waived its ability to raise the same objection in a post-award bid protest. *Blue & Gold, Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (2007). Our court has consistently applied this equitable bar to a disappointed offeror's untimely challenge to a solicitation. *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 697-98 (2010).

Finally, plaintiff argues that the USCG acted arbitrarily and capriciously when it did not examine the reasonableness of CHC's low price proposal.[20] Pl.'s Br. at 59-60. Court House Cleaners' offered price of $2,097,582.00 was 32.83% lower than the IGCE and [XX]% lower

---

[20] Plaintiff also alleges that the USCG "likely used information provided by [plaintiff] during the first round of discussions in order to guide CHC regarding areas of its proposal that needed improvement during the second round of discussions." Pl.'s Br. at 57. This allegation is unsupported by any evidence from the administrative record. Though plaintiff's complaint had alleged violations of the Procurement Integrity Act, 41 U.S.C. § 423(a), plaintiff informed the Court at oral argument that it no longer raised those claims. *See supra* note 3.

than Tech Systems' proposal.[21] Pl.'s Br. at 60; *see* AR at 641.  The USCG's Price Evaluation Report had stated that the "[p]rice analysis shall be done to establish reasonableness of proposals under a best value trade off source selection." AR at 640.  Yet, plaintiff argues, the report itself contained no analysis of the reasonableness of CHC's price.   Pl.'s Br. at 60.  In Tech Systems' view, the Coast Guard erred by not examining whether CHC's price was reasonable when it was 32.83% lower than the IGCE and lacked the "staffing, equipment, management or organization" of the incumbent.  *Id.*

In the Price Evaluation Report, the Contract Specialist compared the total price of each offeror's proposal to price data from the IGCE.  AR at 640.  This IGCE was developed in part from plaintiff's historical costs as the incumbent contractor.  AR at 641.  The Contract Specialist determined that both CHC and Tech Systems had competitively offered pricing that were below the IGCE.  *Id.*  In contrast, Ben-Mar's price was 17% higher than the IGCE, and the Contract Specialist found that it was not reasonable.  *Id.*

In contending that CHC's offer may be "an unreasonable price that reflects a misunderstanding of the contract requirements," Pl.'s Reply at 21, plaintiff conflates price realism and price reasonableness analyses.  According to plaintiff, "the purpose of a price analysis . . . is 'to ensure that an offeror understands the solicitation requirements and actually can perform those requirements prescribed in the [RFP] in the manner that it proposes.'"  Pl.'s Br. at 59-60 (quoting *Erinys Iraq Ltd. v. United States*, 78 Fed. Cl. 518, 531 (2007)).  But plaintiff's quotation, from *Erinys Iraq Ltd. v. United States*, concerned price *realism*, not price reasonableness.  *See* 78 Fed. Cl. at 531.  And while the quoted sentence did conclude with the phrase "the purpose of price reasonableness analysis is to ensure that the offeror's price is not unreasonably high or unreasonably low," *id.*, this was because the RFP at issue specifically called for a "reasonableness" evaluation of price under which "[t]he offeror's proposed prices [were to] be evaluated to determine any unreasonably high or low prices in relation to the offeror's technical proposal." *Erinys Iraq*, 78 Fed. Cl. at 523.  The tailoring services RFP does not contain similar language.  *See* AR at 103.

When such an idiosyncratic definition of "reasonableness" is not in use, it is understood to mean the verification that an offered price is not too high, in contrast with "realism," which concerns proposed prices that are too low.  *See DMS All-Star Joint Venture v. United States*, 90 Fed. Cl. 653, 663 n.11 (2010); Ralph C. Nash & John Cibinic, *Price Realism Analysis: A Tricky Issue*, 12 No. 7 Nash & Cibinic Report ¶ 40 (July 1998).  In any event, *Erinys Iraq* determined that a comparison of proposed prices from multiple competing offerors, in which all proposals satisfied the government's expressed requirements and offered reasonable prices, was sufficient for a rational price reasonableness analysis under 48 C.F.R. § 15.404-1(b)(2)(i). *Erinys Iraq*, 78

---

[21]   The Court notes that there appears to be a computational error in CHC's price -- as the Option Year 1 amount is listed as $432,546, when this should total the same as Option Year 2, which was accurately listed as $434,126.  *See* AR 276.  The underpricing of $1,580, however, is de minimis in a proposal of this size.

Fed. Cl. at 531.  In the instant procurement, multiple offerors competed independently with their price proposals, and the Contract Specialist compared offerors within the competitive range to an IGCE based on historical costs.  This price reasonableness analysis satisfied the requirements of the FAR.

Plaintiff expressly "does not argue that USCG acted unreasonably by not conducting a price realism analysis."  Pl.'s Reply at 20.  But in objecting that the USCG "fails to address how a company lacking the organization, experience, and resources of the incumbent could offer a price [XX]% lower than the incumbent," *id*. at 21, plaintiff is in essence challenging the absence of price realism analysis.  Tech Systems has not, however, demonstrated that a price realism analysis was required for this type of fixed-price contract.  "For an IDIQ contract contemplating fixed-price task orders, the 'realism' of offerors' proposed prices would not ordinarily be considered, because the fixed-price task order puts the risk of underpriced offers on the contractor."  *Afghan American Army Servs. Corp. v. United States*, 90 Fed. Cl. 341, 356 (2009) (citing *Femme Comp. Inc. v. United States*, 83 Fed. Cl. 704, 755 (2008)).  Though the FAR requires cost realism analysis for cost-reimbursement contracts,  it allows cost realism analysis for competitive fixed-price contracts only in exceptional cases, "when new requirements may not be fully understood by competing offerors, there are quality concerns, or past experience indicates that contractors' proposed costs have resulted in quality or service shortfalls."  48 C.F.R. § 15.404-1(d)(3).[22]  Plaintiff, however, does not point to evidence in the administrative record of quality concerns or a past experience of service shortfalls to establish the exceptional circumstances that could warrant the use of price realism analysis.  As the government correctly argues, *see* Def.'s Br. at 39-40, the Coast Guard was under no obligation to examine whether CHC's proposed price was too low.

### 4.  The Best Value Tradeoff Analysis

In conjunction with its argument on price analysis, plaintiff also contends that the Coast Guard acted arbitrarily and capriciously by not conducting a best value tradeoff analysis of Tech Systems' and CHC's proposals.  Pl.'s Br. at 61; Pl.'s Reply at 20.  According to plaintiff, the record does show any comparison of the value offered by each offeror in exchange for the proposed price.  Pl.'s Br. at 61.  No documentation exists, plaintiff argues, to support the USCG's findings that the two proposals were "essentially equal for value offered with technical capability."  Pl.'s Reply at 21.  The Contracting Officer's source selection decision document, which contained a section on "Tradeoff Analysis for Best Value Determination," contradicts this argument.  AR at 665.  In this tradeoff analysis, the Contracting Officer explained that CHC and Tech Systems were "equally technically capable with both being ranked as Satisfactory with low risk and each ha[ving] one strength with one of their subfactors ranked as superior."  *Id.*  The relative advantages of each offeror were described as the lead-in to the TET conclusion that the

---

[22]  Cost realism analysis is also allowed in "competitive fixed-price incentive contracts." 48 C.F.R. § 15.404-1(d)(3).  No one contends the tailoring services procurement concerns such a contract.

two were "essentially equal." *Id.* With the finding that both CHC and Tech Systems had Superior ratings for Past Performance, in the tradeoff, CHC's lowest offered price was the determining factor for the award. *Id.* This is ample articulation of the reason the awardee's proposal offered best value to the government, and the Court cannot substitute its judgment for that of the contracting officer regarding the relative technical quality of the proposals. *See Galen Med. Assocs., Inc. v. United States*, 369 F.3d 1324, 1330 (Fed. Cir. 2004) ("[A]s the contract was to be awarded based on 'best value,' the contracting officer had even greater discretion than if the contract were to have been awarded on the basis of cost alone."); *E.W. Bliss*, 77 F.3d at 449.

### 5. The Responsibility Determination

The FAR requires the contracting officer to make an affirmative determination of a proposed awardee's responsibility before an award can be made. 48 C.F.R. § 9.103(b). Plaintiff argues that the Coast Guard acted arbitrarily and capriciously because it did not conduct a full inquiry in determining CHC's responsibility. Pl.'s Br. at 62. Though Tech Systems acknowledges that contracting officers are entitled to deference in such matters, it contends that there is no documentation that the Contracting Officer considered five of the seven responsibility standards of 48 C.F.R. § 9.104-1. Pl.'s Br. at 62-64. According to plaintiff, the Contracting Officer's past performance review and consultation of federal databases were not sufficient for a responsibility determination when CHC had never before possessed a government contract. Pl.'s Br. at 63; Pl.'s Reply at 22. The government, on the other hand, argues that courts have traditionally deferred to the agency's responsibility finding, Def.'s Br. at 41-42, and contends that under 48 C.F.R. § 9.105-2(a), the contracting officer's signature is sufficient for a determination of responsibility without any further rationale. Def.'s Br. at 42 (citing *Marwais Steel Co. v. Dep't of Air Force*, 871 F.Supp. 1448, 1455 (D.D.C. 1994)).

Contracting officers enjoy "wide discretion" in making responsibility determinations and deciding how much information is required to do so. *See Bender Shipbuilding & Repair Co. v. United States*, 297 F.3d 1358, 1362 (Fed. Cir. 2002). "Although FAR § 9.105-1(a) does require the contracting officer to have, or to obtain, enough information to make a responsibility determination, the contracting officer is the arbiter of what, and how much, information he needs." *John C. Grimberg Co. v. United States*, 185 F.3d 1297, 1303 (Fed. Cir. 1999). The agency is not required to explain its affirmative determination of responsibility unless record evidence suggests arbitrary and capricious action. *Domenico Garufi*, 238 F.3d at 1338. *Domenico Garufi* was the "rare case in which an explanation is required" for a contracting officer's responsibility determination, because the record before the contracting officer reflected Italian court proceedings and other evidence connecting the awardee to criminal activity concerning past government contracts. *Id.* at 1327-1328, 1338.

Plaintiff has not identified record evidence that would lead the Court to question the Contracting Officer's responsibility determination. Though the FAR lays out the seven elements of a responsibility determination, *see* 48 C.F.R. § 9.104-1, the Contracting Officer does not need to explain his decision absent evidence suggesting that the Contracting Officer's decision was

arbitrary and capricious.  In questioning CHC's ability to perform the contract, plaintiff has argued that CHC has never possessed a government contract and seems to employ few individuals.  Pl.'s Reply at 22.  The government, however, points out that CHC did successfully perform the tactical vest alteration contract with the Coast Guard, and that CHC's proposal provides for a staff of at least six employees.  Def.'s Reply at 16-17; *see* AR at 282, 293.  In any event, neither inexperience with government contracting nor having a small staff are in the same league as the criminal convictions of an associate, and the Court concludes the former do not raise the type of serious questions justifying an inquiry into the rationality of a responsibility determination.  To find otherwise would impose a particular burden on the agencies that work with small businesses.  As plaintiff has not made a threshold showing to rebut the presumption of regularity, the Court will not substitute its judgment for that of the Contracting Officer.

### 6.  The Alleged Bias and Bad Faith of USCG Officials

Tech Systems argues that the TET's "deplorable evaluations of the competing proposals" could only be explained by bias against it, Pl.'s Br. App. A at 4, and contends that the animus exhibited by the former COTR assigned to its predecessor contract is the explanation.  *See id.* at 2-4.  Plaintiff supplemented the record with multiple declarations concerning the conduct of this individual, CWO Samaniego, who remained at the site as facility manager after being replaced as COTR for plaintiff's bridge contracts following plaintiff's complaints about his actions.  *See* Pl.'s Mot. to Supp. Admin. R. ("Pl.'s Mot.") Ex. E.  Tech Systems believes that these declarations demonstrate "consistent and relentless bias against TSI and in favor of CHC."  Pl.'s Br. App. A at 2.

According to Chris Blethen, Vice President of Tech Systems, a government worker informed him that CWO Samaniego had boasted that "he decides who wins the contract" and had said things that made the women working at the tailor shop cry.  *See* Pl.'s Mot. Ex. A; Pl.'s Br. App. A at 2-3.  The shop manager, Rosalind Spragg, states, *inter alia*, that CWO Samaniego told her on March 4, 2010 that plaintiff was "not going to win the contract"; threatened "[y]our day will come" when he was not able to press his uniform in their shop on May 3, 2010; stated during a September 2010 fire drill that Tech Systems "will be out of here soon"; and was overheard on September 28, 2010 laughing on the phone that CHC's owner "won the contract" and "[t]hey'll be out soon."  Pl.'s Mot. Ex. B.  She also states that CWO Samaniego insisted on borrowing plaintiff's "Z Racks" to be used for CHC's owner's garage sale, and was belligerent when told to return them.  *Id.*  In addition, Ms. Spragg also stated CHC's owner appeared to go into CWO Samaniego's office before an "Industry Day" site visit for prospective offerors, and left with a thick stack of papers that no one else received.  *Id.*

Two of plaintiff's tailors declare that they heard CWO Samaniego, during a spring 2010 fire drill, make statements to the effect that plaintiff's operation would soon be gone from TRACEN.  *See* Pl.'s Mot. Exs. C, D.  Nancy Blethen, President and CEO of Tech Systems, recounted multiple instances of the facility manager allegedly verbally harassing its employees.  Pl.'s Mot. Ex. E.  Plaintiff argues that these declarations were evidence of bias on the part of not

just CWO Samaniego, but also his supervisor, Lt. Rodriguez and the Technical Evaluation Team. Pl.'s Br. App. A at 5.

In response to plaintiff's supplementation of the administrative record, the government submitted declarations from CWO Samaniego and four individuals involved in the Coast Guard's procurement decision. *See* Def.'s Mot. to Supp. Admin. R. ("Def.'s Mot."). Lieutenant Rodriguez and Mr. Evelyn both stated that CWO Samaniego did not participate in the evaluation process or influence the Technical Evaluation Team. Def.'s Mot. Ex. 1 and Ex. 4. Chief Warrant Officer Petro stated that he had no contact with CWO Samaniego during the past performance evaluation. Def.'s Mot. Ex. 2. As a witness who was present on Industry Day, Mr. Dawson explained that CHC's owner did not meet with CWO Samaniego and that her stack of papers was a copy of the RFP. Def.'s Mot. Ex. 3. And CWO Samaniego stated that he had no involvement in the procurement process, had no contact with CHC's owner about the solicitation, and in fact borrowed Tech Systems' clothing racks for the use of a Coast Guard officer who had the same first name as CHC's owner. Def.'s Mot. Ex. 5.

After reviewing these competing declarations, the Court finds that plaintiff has not met the burden of proof to establish that CWO Samaniego's animus toward it influenced the procurement decision. Neither the SSP nor the various technical evaluation reports show that CWO Samaniego had any role in evaluating Tech Systems' technical capability. *See* AR at 250, 473-531. In addition, as explained above, the Coast Guard did not unreasonably or arbitrarily evaluate the proposals, so Tech Systems did not receive any ratings that would be hard to explain absent bad faith. And while September 28, 2010 -- the day CWO Samaniego was allegedly overheard exclaiming that CHC had won the contract, *see* Pl.'s Mot. Ex. B -- was coincidentally when the TET composed its initial TET Report, *see* AR at 625, this report merely found CHC and plaintiff technically equal, and was drafted without knowledge of the price evaluation, conducted three weeks later. *See* AR at 640-42. Moreover, there is no evidence to suggest that the Contracting Officer, Contract Specialist, and Past Performance Evaluator, all of whom were based in Washington, D.C., *see* AR at 249-251, would have had close contacts with CWO Samaniego in New Jersey, to provide motivation for any malicious collusion.

The parties agree that claims of bias and bad faith must be proven by clear and convincing evidence. *See* Pl.'s Br. App. A at 1 (citing *Am-Pro Protective Agency, Inc. v. United States*, 281 F.3d 1234, 1239-40 (Fed. Cir. 2002)); Def.'s Br. App. at 14 (citing same). This higher burden of proof has been "equated with evidence of some specific intent to injure the plaintiff." *Galen Med. Assocs.*, 369 F.3d at 1330 (quoting *Torncello v. United States*, 681 F.2d 756, 770 (Ct. Cl. 1982)). Nothing close to this has been shown in the administrative record, even after supplementation. At most, the declarations from Tech Systems' employees are evidence that CWO Samaniego, who apparently did bear animus toward plaintiff, stated that he could influence the procurement decision and wanted plaintiff to lose. The record does not contain any evidence of actual influence he may have had on the decision, much less the "clear and convincing evidence" that Tech Systems concedes is needed to establish that the *agency* action was tainted by his bias.

In sum, the Court finds that the Coast Guard did not act arbitrarily and did not violate any statutes or regulations in awarding the tailoring services contract to Court House Cleaners. Accordingly, plaintiff's motion for judgment on the administrative record is DENIED and defendant's cross-motion for judgment on the administrative record is GRANTED.  Having failed to prevail on the merits, Tech Systems' motion for permanent injunctive relief must necessarily also fail, and is thus DENIED.  *See Gulf Group*, 61 Fed. Cl. at 364; *Computer Scis. Corp. v. United States*, 51 Fed. Cl. 297, 323 (2002).

## III.  CONCLUSION

For the foregoing reasons, the Court **DENIES** plaintiff's motions for judgment on the administrative record and for injunctive relief, and correspondingly **GRANTS** defendant's cross-motion for judgment on the administrative record.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski
**VICTOR J. WOLSKI**
Judge